[No. C041673. Third Dist. Apr. 2, 2004.]

KEVIN BUSHLING, Plaintiff and Appellant, v.
FREMONT MEDICAL CENTER et al., Defendants and Respondents.

COUNSEL

Michael J. Zinicola, for Plaintiff and Appellant.

Lanius & Associates and Patrick A. Lanius for Defendant and Respondent, Fremont Medical Center.

Holt & Associates and Eric S. Emanuels for Defendant and Respondent, Philip Caruso, M.D.

Schuering Zimmerman & Scully, Donna W. Low and Steven M. McKinley for Defendant and Respondent, Charles Rosson, M.D.

## OPINION

**HULL, J.**—Plaintiff Kevin Bushling underwent surgery on February 16, 1999, to remove his gall bladder and to biopsy a mole on his abdomen. The following morning plaintiff began to experience pain in his left shoulder. Thereafter, he filed this action against the surgeon and the anesthesiologist who performed the February 16 surgery and the hospital in which it took place, alleging they had been negligent in his treatment and care, which resulted in the injury to his shoulder.

Defendants filed a summary judgment motion and produced evidence to show that they were not guilty of negligence in plaintiff's treatment or care. Plaintiff opposed the motion, relying primarily on declarations from two medical experts, Dr. Katz and Dr. Mar, to establish a triable issue of material fact. The trial court found that plaintiff's evidence on the motion did not raise a triable issue of material fact and entered judgment for the defendants. Plaintiff appeals.

Because the declarations of Dr. Katz and Dr. Mar failed to provide a factual basis or a reasoned explanation for the doctors' opinion that defendants were guilty of negligence, the declarations were of no evidentiary value. Plaintiff failed to establish a triable issue of material fact and we affirm the judgment.

### FACTS AND PROCEEDINGS

On May 15, 2000, plaintiff filed his action for negligence, alleging that defendants Fremont Medical Center (Medical Center), Phillip Caruso, M.D., and Charles Rosson, M.D., negligently caused damage to plaintiff on February 16, 1999, in that they or their agents "assisted, performed, diagnosed and treated [plaintiff] in such a negligent manner during and after surgery so as to cause severe damage to [plaintiff's] shoulder" and that their conduct fell below the applicable standard of care. The complaint further alleged that defendants' negligence was "the substantial, proximate, direct cause" of the injury to plaintiff, which included nerve damage and loss of use of his shoulder. Each defendant denied the allegations and asserted numerous affirmative defenses. Later in the proceedings each defendant filed motions for summary judgment.

#### Dr. Caruso's Motion

On March 6, 2002, Dr. Caruso filed his motion for summary judgment. He asserted that the medical care he provided to plaintiff fell within the appropriate standard of care and that plaintiff could not establish a causal connection between his injury and the surgery or to his aftercare.

In his separate statement of undisputed facts Dr. Caruso asserted: When Dr. Rosson performed a laparoscopic cholecystectomy on plaintiff at the Medical Center on February 16, 1999, Dr. Caruso served as the anesthesiologist. Dr. Caruso provided general anesthesia services during surgery, including positioning, and assisted in plaintiff's transfer to the post-anesthesia care unit. He had no further contact with plaintiff.

Nothing occurred during the February surgery or during plaintiff's transportation from the operating room to have caused injury to his shoulder. Dr. Caruso's care and treatment was appropriate and within the standard of care.

Plaintiff saw Dr. Stephen Weber for an orthopedic consultation on June 22, 1999, at which time plaintiff complained of left shoulder pain related to his February operation. Dr. Weber subsequently performed surgery on plaintiff's shoulder, which included release of the transverse ligament over the nerve.

In support of his motion and his statement of undisputed facts, Dr. Caruso filed his declaration, stating, in general, that he was the anesthesiologist during plaintiff's surgery, that he had reviewed all of the medical records relating to that surgery, and that his care and treatment of plaintiff consisted of providing general anesthesia services to plaintiff and accompanying him to the post-anesthesia care unit. Dr. Caruso also declared that he was familiar with "the types of injuries which can occur due to positioning or trauma associated with surgical procedures involving general anesthesia, including laparoscopic cholecystectomies" and that "[t]here was nothing which occurred during [plaintiff's] surgery or transportation from the operating room which caused injury to his shoulder."

Dr. Caruso submitted the declaration of Dr. Ritu Jain, a board certified anesthesiologist, who stated that because she had been the anesthesiologist in laparoscopic cholecystectomies more than 100 times, she was familiar with the surgical and anesthesia procedures involved in plaintiff's surgery and with the types of injuries that can occur during them. Based on her experience, together with her review of all the records in the case and the deposition testimony of Dr. Weber, it was her opinion that Dr. Caruso met the standard of care in all his actions.

Dr. Caruso also submitted portions of Dr. Weber's deposition. Dr. Weber testified that during his orthopedic consultation with plaintiff on June 22, 1999, plaintiff reported that he went to sleep during the February operation in a supine position, then experienced disabling pain on waking. Dr. Weber determined that it was unlikely that plaintiff's injury was a traction injury, "given the fact that his entire procedure was probably performed supine." Dr. Weber thereafter operated on plaintiff's shoulder and found there was no tear

to plaintiff's rotator cuff. Dr. Weber also said that "as with carpal tunnel at the wrist," he was able to release the transverse ligament, which is a tight ligament that runs over the top of a small notch in the scapula. That procedure allows more space in that area of the shoulder.

During the surgery Dr. Weber found nothing consistent with trauma to, or a traction injury of, plaintiff's shoulder. He testified that in his opinion, based on reasonable medical probability, "this nerve injury had no specific cause, i.e., positioning or other problems, and that's what the bulk of the literature suggests, certainly my personal experience with these injuries." Dr. Weber concluded that plaintiff's injury was "idiopathic," explaining: "[I]diopathic means we don't know. I think we do know what probably didn't cause it. That's what idiopathic is all about. [¶] I'd like to be better by saying idiopathically we don't know what causes it. That's what it is or another way to phrase idiopathic. I mean, there usually is no cause. [¶] I don't know how to be more clear. It[']s a frustrating concept, but I think maybe I could phrase it idiopathic means there usually is no cause."

*Dr. Rosson's Motion*

Dr. Rosson's motion similarly asserted that his care and treatment of plaintiff was within the applicable standard of care and that plaintiff could not show a triable issue of fact as to causation.

Dr. Rosson's separate statement of undisputed facts asserted that plaintiff appeared at the emergency room at the Medical Center on February 13, 1999, with upper abdominal discomfort. After an evaluation by Dr. Richard Evans, plaintiff was admitted to the hospital. Dr. William Irvine asked Dr. Rosson to consult on plaintiff's case on February 15, 1999. Dr. Rosson determined that plaintiff suffered from acalculous cholecystitis and Gilbert's disease (benign liver disease). Dr. Rosson recommended plaintiff undergo an endoscopic cholecystectomy and possibly a cholangiogram.

Dr. Rosson explained to plaintiff that an open cholecystectomy might have to be performed if the doctors encountered problems with the endoscopic procedure. Plaintiff understood the risks and benefits of the procedure. On February 16, 1999, he signed a consent and authorization form.

Plaintiff arrived in the operating room at 11:55 a.m. on February 16, 1999. Anesthesia was started and Dr. Rosson made the incision at 12:25 p.m. The incision was closed and plaintiff left the operating room at 1:20 p.m. According to Dr. Rosson's contemporaneous operative report, plaintiff was transferred to the recovery room and he tolerated the procedure well. He remained stable throughout the day.

At 8:00 a.m. on February 17, 1999, plaintiff first complained of bilateral shoulder pain; medications were administered as ordered. He was discharged later that day after it was determined that his recovery from surgery was uneventful.

On February 23, 1999, during a follow-up examination with Dr. Rosson, plaintiff complained again of left shoulder pain. Dr. Rosson relieved the complaint with an injection of Marcaine and ordered a follow-up examination in one week.

On March 3, 1999, plaintiff returned to see Dr. Rosson and said he had "started physical therapy for his left shoulder pain. Dr. Rosson noted the pain had returned."

After plaintiff's discharge, Dr. William Hope, a neurologist, treated him on referral from an orthopedist. Dr. Hope determined as of May 17, 1999, that "plaintiff suffered from a suprascapular nerve palsy of the left shoulder."

Dr. Weber, a board certified orthopedic surgeon, evaluated plaintiff on June 22, 1999. Dr. Weber concluded that plaintiff suffered from a suprascapular neuropathy. He discussed its etiology with plaintiff and explained he found it "hard to believe" that the injury was a traction injury, because plaintiff's surgical procedure on February 16 was probably performed in the supine position. Dr. Weber noted that many such injuries were "idiopathic in nature, occurring for a variety of reasons after a variety of types of surgical procedures that are well-performed, well-reported in the literature."

On July 13, 1999, Dr. Weber performed a suprascapular nerve release on plaintiff's left shoulder. The procedure was conducted without complication.

Dr. Rosson included in his motion plaintiff's medical records and a declaration from Dr. Luther Cobb, a board certified general surgeon. Based on his familiarity with the standard of care in general surgery (including over 500 laparoscopic cholecystectomies that he had performed) and his review of the records in the case, Dr. Cobb declared that the bilateral shoulder pain of which plaintiff complained the day after his February surgery is a recognized risk of laparoscopic cholecystectomy and can occur in the absence of negligence. It was not caused by the surgery. Dr. Rosson's treatment was within the applicable standard of care.

Dr. Rosson also included in his motion an excerpt from Dr. Weber's deposition that essentially paralleled the excerpts filed with Dr. Caruso's motion.

*The Medical Center's Motion*

The Medical Center asserted that Dr. Weber's testimony established that plaintiff could not show negligence or causation and that he had not offered any expert evidence to the contrary.

The Medical Center's separate statement of undisputed facts alleged, in addition to that which the other separate statements alleged: (1) Dr. Weber determined during surgery that plaintiff did not suffer from a rotator cuff tear; (2) Dr. Weber was still of the opinion that plaintiff's shoulder injury was not caused by positioning, trauma, or traction; (3) based on reasonable medical probability, the injury was not caused by a sharp blow to the top of the shoulder or by being dropped on the shoulder; (4) plaintiff's problem was in the nature of mononeuritis, an inflammation of the nerve, unrelated to positioning or any alleged trauma during or after the original surgery.

The Medical Center attached medical records and excerpts from plaintiff's discovery responses as exhibits, along with Dr. Weber's deposition and curriculum vitae.

*Plaintiff's Opposition to the Motions*

In plaintiff's consolidated opposition to defendants' motions, he asserted, based primarily on the declarations of Drs. Ronald Katz and Timothy Mar, that triable issues of fact existed as to negligence. In the alternative, also based on those declarations, he requested a continuance for further discovery into the cause of his injury.

In response to the Medical Center's assertion that plaintiff's original surgery was performed with plaintiff in the supine position, plaintiff asserted that (1) the surgery was merely begun in that position; (2) according to the operative report, plaintiff was moved during the surgery to remove a mole from his back; (3) the report failed to show the position of plaintiff's left arm or how this other procedure took. The report, which plaintiff relied on for the allegation that he was turned from the supine position during surgery, states that the operation performed was an "endoscopic cholecystectomy and incision of a mole on the right anterior side of the abdomen . . . ."

In response to the Medical Center's claim that Dr. Weber informed plaintiff and his wife on June 22, 1999, that plaintiff's injury was not a traction (positioning) injury, plaintiff asserted that (1) Dr. Weber's report merely stated it was "hard to imagine traction injury when procedure probably performed in supine"; (2) Dr. Katz's declaration shows that Dr. Weber was

wrong to testify that the medical literature does not support the theory that positioning can cause injuries like plaintiff's.

In response to the Medical Center's assertion that Dr. Weber told plaintiff on June 22, 1999, that his injury was idiopathic in nature, plaintiff asserted that to Dr. Weber "idiopathic" means "he does not know."

In response to the Medical Center's assertion that Dr. Weber held the opinion after performing his surgery that plaintiff's shoulder problem was not caused by positioning, trauma, or traction, plaintiff asserted that Dr. Weber admitted he did not know how plaintiff's left arm was positioned during the original surgery.

In response to the Medical Center's claims of (a) ruling out a sharp blow to the top of plaintiff's shoulder, being dropped on his shoulder, positioning, or transportation from the operating room as causes of his injury and of (b) defining those causes as "idiopathic and in the nature of a mononeuritis or inflammatory problem unrelated to the positioning or any alleged trauma," plaintiff took the position that the declarations of Dr. Katz and Dr. Mar showed it was more probable than not the injury occurred from negligent traumatic injury or improper positioning or stretching of the extremity.

In response to Dr. Caruso's assertion that nothing occurred during surgery or transportation from the operating room to have caused plaintiff's injury and that all of his treatment was within the standard of care, plaintiff asserted that (1) the declarations of Dr. Katz and Dr. Mar were to the contrary, as well as (2) the suspicions of Drs. Hope and Vallier (who did follow-up treatment) of a positioning injury, and (3) Dr. Weber's lack of knowledge about the causation of the injury and the positioning of plaintiff's arm during the surgery.

In response to Dr. Rosson's evidence that plaintiff signed an authorization form for the surgery, knowing the risks and benefits, plaintiff asserted that the authorization did not mention the risks of improper positioning, dropping, or stretching of the extremity.

In response to Dr. Rosson's claim that plaintiff tolerated the procedure well, remained postoperatively stable throughout the day, and was eventually discharged the following day after it was determined he had recovered uneventfully from the surgery, plaintiff asserted: "DISPUTED INJURY TO SHOULDER and repeatedly sedated[.] See plaintiff's 'H' Fremont records post-surgery."

In response to Dr. Rosson's claim that Dr. William Hope, who treated plaintiff after his discharge, determined by May 17, 1999, that plaintiff

suffered from a suprascapular nerve palsy of the left shoulder, plaintiff relied on, and attached as an exhibit to his opposition, an evaluation report prepared by Dr. Garry T. Vallier, who suspected a possible positioning injury. Plaintiff also attached a neurological referral report by Dr. William G. Hope, which stated that Dr. Hope was "unable to explain [plaintiff's condition] in terms of expected course of [the February 16] surgery and [was] suspicious that this could even have been coincidental though concern over positioning resulting in pressure to the suprascapular nerve intraoperatively has been raised."

Plaintiff responded to Dr. Rosson's assertions that Dr. Weber thought the injury was idiopathic and that Dr. Rosson's treatment was within the standard of care and did not cause plaintiff's injury, by reciting the qualifications of his experts, Dr. Katz and Dr. Mar, then setting out their contrary opinions; plaintiff also asserted that he could not have been supine throughout the surgery unless defendants removed the mole on his back through a hole in the operating table.

*The declaration of Dr. Katz*

The declaration of Ronald Katz, M.D., furnished by plaintiff in opposition to the motion, reads as follows:

"I RONALD KATZ M.D., declare:

"1. I am a licensed physician in the State of California and have been practicing anesthesiology for 42 years and I am board certified. I was a professor of anesthesiology and chairmen [*sic*] of the department at UCLA from 1973 to 1990 and professor from 1990 to 1995. I was chairmen [*sic*] of the department and professor of anesthesiology at USC from 1995–2000. I am now professor of anesthesiology at USC and UCLA.

"2. I have reviewed the medical records of Kevin Bushling from Dr[.] Rosson, Fremont Medical [C]enter, Sutter North, Dr[.] Weber, Dr[.] Vallier, and all surgical Reports and the deposition of Dr[.] Weber. I am familiar with the laparoscopic cholecystectomy performed on Mr[.] Bushling and the injury, Supra Scapula nerve palsy injury that he suffered and the standard of care for anesthesiologists[,] surgeons and hospital staff during and post surgery. It is the duty of the anesthesiologist, as well as the surgeon and hospital staff to safe guard [*sic*] the patient from traumatic and positioning injuries during surgery and post surgery.

"3. I am of the opinion that his injury that [*sic*] Mr[.] Bushling's condition occurred more probably than not from either a traumatic injury such as dropping the patient or from improper positioning of the patient or stretching

of the extremity and but for the negligence of one of his care providers this injury would not have occurred.

"Further discovery such [as] depositions of the doctor defendants and hospital staff will be necessary to [p]inpoint whose negligence is responsible for this injury and who fell below the standard of care. Dr[.] Weber is incorrect because there is a wealth of literature describing just such injuries from improper positioning and trauma during surgery.

"I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and within my personal knowledge. If called as a witness, I can competently testify to the facts and opinions stated herein. Executed on March 27[,] 2002[,] at Los Angeles California. [/s/ Ronald Katz M.D.]"

*The declaration of Dr. Mar*

The declaration of Timothy Mar, M.D., furnished by plaintiff in opposition to the motion reads as follows:

"I, TIMOTHY MAR M.D., declare:

"1. I am a licensed physician in the State of California and have been practicing Orthopedic Surgeon [*sic*] for 13 years and I am board certified. I have perform[ed] general surgery and I have assisted in the laporo Scopic cholecystectomy surgery like the one performed on Mr[.] Bushling. I am familiar with the standard of care of a surgeon during such a procedure and the and the [*sic*] that of the h[o]spital staff in safeguarding a patient during and post surgery.

"2. I have reviewed the medical records of Kevin Bushling from Dr[.] Rosson, Fremont Medical [C]enter, Sutter North, Dr[.] Weber, Dr[.] Vallier, and all surgical Reports and the deposition of Dr[.] Weber. I am familiar with the injury, Supra Scapula nerve palsy injury[,] that he suffered and the causes of such injuries.

"3. I am of the opinion that his injury [—] that Mr[.] Bushling's condition occurred more probably than not from either a traumatic injury such as dropping the patient or from improper positioning of the patient or stretching of the extremity and but for the negligence of one of his care providers this injury would not have occurred.

"Further discovery such [as] depositions of the doctor defendants and hospital staff will be necessary to [p]inpoint whose negligence is responsible for this injury and who fell below the standard of care.

"I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and within my personal knowledge. If called as a witness, I can competently testify to the facts and opinions stated herein. Executed on March ___ 2002[,] at ___[,] California. [/s/ Timothy Mar, M.D.]"

Finally, if the court was inclined to grant the summary judgment motion, plaintiff requested a 120-day continuance of the hearing based on Drs. Katz's and Mar's opinions that depositions of the defendants and hospital staff were necessary "to [p]inpoint whose negligence is responsible for this injury . . . ."

### Defendants' Replies

Citing *Kelley v. Trunk* (1998) 66 Cal.App.4th 519 [78 Cal.Rptr.2d 122] (*Kelley*), all defendants asserted that the Katz and Mar declarations were wholly conclusory and therefore insufficient to defeat summary judgment. Dr. Rosson and the Medical Center also filed evidentiary objections to the declarations, asserting that Dr. Katz's and Dr. Mar's declarations lacked foundation.

Each defendant objected to plaintiff's request for a continuance on the basis that at the time of the motion, the litigation had been pending for approximately two years during which time plaintiff had not initiated discovery. Defendants argued that plaintiff had not prosecuted the action diligently and that plaintiff's request for further time for discovery should be denied.

### The Trial Court's Ruling

The trial court issued an order granting summary judgment to all defendants, finding that plaintiff's declarations were deficient pursuant to *Kelley*, and thus plaintiff's opposition to the motion failed to raise a triable issue of material fact as to the standard of care or causation. The court did not expressly sustain the defendants' evidentiary objections to the declarations of Dr. Katz and Dr. Mar. The court sustained an objection to the reports of Drs. Vallier and Hope on the basis that they were hearsay and lacked foundation, a ruling which plaintiff does not challenge on appeal. The court granted summary judgment to the doctor defendants on the separate and independent grounds of an insufficient showing of a violation of the standard of care and causation, and to the Medical Center on the issue of causation. The court thereafter entered judgment dismissing plaintiff's action.

## DISCUSSION

## I

### *The Trial Court's Ruling Granting Summary Judgment*

A. *California summary judgment law.*

After a trio of rulings by the United States Supreme Court in 1986 clarifying the federal law of summary judgment (*Matsushita Elec. Ind. Co. v. Zenith Radio* (1986) 475 U.S. 574 [89 L.Ed.2d 538, 106 S.Ct. 1348]; *Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242 [91 L.Ed.2d 202, 106 S.Ct. 2505]; and *Celotex Corp. v. Catrett* (1986) 477 U.S. 317 [91 L.Ed.2d 265, 106 S.Ct. 2548]), the Legislature amended the statutes relating to summary judgment law in California. The Legislature's purpose was to amend California's laws so that state summary judgment practice would more closely conform to federal practice, which would, in turn, liberalize the granting of summary judgment motions. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 847–848 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).)

The legislative amendments and the California Supreme Court's interpretation of those amendments in *Aquilar* have provided the courts with points of reference by which summary judgment motions must now be determined.

■ Thus, the party moving for summary judgment bears the burden of persuading the court that there is no triable issue of material fact and that the moving party is entitled to judgment as a matter of law. There is a triable issue of material fact if the evidence on the motion would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion given the applicable standard of proof. (*Aguilar, supra,* 25 Cal.4th at p. 850.)

■ Further, the party moving for summary judgment initially must produce evidence sufficient to make a prima facie showing of the nonexistence of a triable issue of material fact. If the moving party makes that showing, the party opposing the motion then has the burden of producing evidence sufficient to make a prima facie showing of the existence of a triable issue of material fact. (*Aguilar, supra,* 25 Cal.4th at pp. 850–851.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Id.* at p. 851.)

■ Where, as here, a defendant moves for summary judgment and the plaintiff bears the burden of proof by a preponderance of the evidence at trial

on the issues that are the subject of the motion, the defendant initially "must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not . . . ." (*Aguilar, supra,* 25 Cal.4th at p. 851.) More specifically, a moving defendant must make a prima facie showing that the plaintiff does not possess, and cannot reasonably obtain, sufficient evidence to establish at least one element of plaintiff's cause of action. (*Id.* at p. 854.) If a defendant has met that burden, the plaintiff must then present evidence that would allow a reasonable trier of fact to find in his favor more likely than not. (See *id.* at p. 852.) If the court determines that the evidence presented by the plaintiff and all of the reasonable inferences drawn therefrom show one or more of the elements of the cause of action only as likely as, or less likely than, an absence of one or more of those elements, it must grant a defendant's motion for summary judgment. (See *id.* at p. 857.)

"On appeal, we review the record de novo to determine whether the moving party met its burden of proof." (*Lewis v. County of Sacramento (2001)* 93 Cal.App.4th 107, 116 [113 Cal.Rptr.2d 90].) We consider " 'all of the evidence set forth in the [supporting and opposition] papers, except that to which objections have been made and sustained by the court, and all [uncontradicted] inferences reasonably deducible from the evidence.' " (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 612 [76 Cal.Rptr.2d 479, 957 P.2d 1313].)

### B. *The moving parties' evidence in support of the motions.*

We first consider whether defendants produced evidence sufficient to constitute a prima facie showing that in this matter, there is no triable issue of material fact. We conclude that they did.

To prevail at trial, plaintiff will be required to prove by a preponderance of the evidence that (1) the defendants were negligent, that is, they breached the applicable standard of care, (2) that plaintiff was harmed, and (3) that defendants' negligence was a substantial factor in causing plaintiff's harm. (Judicial Council of Cal., Civil Jury Instns. (2003–2004) CACI Nos. 400, 501, 502.)

Defendants placed evidence before the trial court that challenged two elements of plaintiff's action, the violation of the standard of care and causation. Summarized, defendants' evidence showed that the doctors who performed the surgery did so within the standard of care, that the hospital's treatment of plaintiff was also within the standard of care and that plaintiff's shoulder pain was not caused by any deficiency in their services. More specifically, the doctors and the hospital declared that plaintiff's surgery was conducted in accordance with established medical and surgical procedures

and without complication and that his recovery was uneventful. The moving parties placed before the court the plaintiff's medical records relating to the procedure and plaintiff's recovery. The records were consistent with the declarations filed in support of defendants' motions.

Defendants also presented portions of Dr. Weber's deposition testimony. Dr. Weber described the medical care he provided to plaintiff when he attempted to relieve plaintiff's pain, including the surgery Dr. Weber performed on plaintiff's shoulder. Dr. Weber's surgical examination of plaintiff's shoulder revealed that plaintiff's rotator cuff was not torn and that there was no evidence of trauma to plaintiff's shoulder. It was Dr. Weber's opinion that plaintiff's injury was "idiopathic." He explained that term meant the injury had an unknown cause, or no cause, and that the examination and surgery he performed was consistent with an idiopathic injury, because it revealed no indication that the injury to plaintiff's shoulder was caused by a blow to the shoulder or so-called "traction injury" or other trauma. Dr. Weber concluded that the nerve injury was of unknown cause, one that could have "occurr[ed] for a variety of reasons after a variety of types of surgical procedures that are well-performed, well-supported in the literature."

It is unclear whether plaintiff contended in the trial court that defendants had not produced evidence sufficient to support a prima facie case in defendants' favor. While plaintiff mentioned in passing that "[d]efendants rely heavily on Dr. Weber who admitted he did not know the cause of [plaintiff's] injury," plaintiff then turned to his own evidence on the motion, arguing that the declarations of Dr. Katz and Dr. Mar were sufficient to demonstrate there was a triable issue of material fact.

■ We do not construe plaintiff's incomplete recitation of Dr. Weber's opinion, which is unaccompanied by argument on the point, as a claim that defendants failed to produce evidence sufficient to establish a prima facie case in their favor thus relieving plaintiff of the burden of meeting that evidence. But even if we did, we conclude that the moving parties' production of evidence was sufficient to support their position, that is, paralleling the words of *Aguilar,* sufficient to require a reasonable trier of fact not to find a violation of the applicable standard of care and not to find that plaintiff's injury was caused by anything that defendants did or failed to do.

On appeal plaintiff enlarges his attack on defendants' initial production of evidence by arguing that the declarations of Dr. Rosson, Dr. Cobb, and Dr. Jain are conclusory and thus insufficient to establish a prima facie case for the defense. Assuming without deciding that plaintiff can raise this argument without having objected to the declarations on this basis in the trial court and that this argument is a pure question of law that can be raised for the first

time on appeal (see generally *State of California ex rel. Public Works Bd. v. Bragg* (1986) 183 Cal.App.3d 1018, 1023–1024 [228 Cal.Rptr. 576]), we reject it.

It is not conclusory for Dr. Rosson to describe his treatment of plaintiff and state that he was not negligent. The declarations of Dr. Cobb and Dr. Jain, both of whom are experienced in the relevant medical procedures and both of whom reviewed the plaintiff's medical records relating to the surgery (and in Dr. Jain's case, based also on the deposition testimony of Dr. Weber) were also admissible. To state that one has experience in certain medical procedures and has reviewed pertinent medical records and that based on that experience and that review, the declarant has found nothing to support a claim of medical malpractice and therefore concludes that there was none is not an improper conclusion for an expert witness. The expert has given an explanation for that expert's conclusion that defendants are not guilty of medical malpractice: Based on the expert's experience and the patient's medical records, there is no evidence to support a claim of negligence as a cause of injury. The reason for the opinion is the absence of evidence of medical malpractice. That opinion is significantly different than one that concludes that the standard of care has not been met resulting in an injury, but fails to give a reasoned explanation, based on facts and not on speculation, of why the expert has come to those conclusions.

### C. *Plaintiff's evidence in opposition.*

■ In a matter such as this, where the conduct required of a medical professional is not within the common knowledge of laymen, a plaintiff must present expert witness testimony to prove a breach of the standard of care. (*Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 1001 [35 Cal.Rptr.2d 685, 884 P.2d 142]; *Landeros v. Flood* (1976) 17 Cal.3d 399, 410 [131 Cal.Rptr. 69, 551 P.2d 389].) Plaintiff also must show that defendants' breach of the standard of care was the cause, within a reasonable medical probability, of his injury. (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117–1118 [8 Cal.Rptr.3d 363] (*Jennings*).)

As related above, plaintiff attempted to meet defendants' prima facie showing by presenting the medical records relating to plaintiff's surgery and follow-up care, the declarations of Drs. Katz and Mar, and references to Dr. Weber's deposition. Because the trial court sustained objections to the documents relating to Dr. Vallier's and Dr. Hope's examinations of plaintiff, a ruling plaintiff does not challenge on appeal, we may not consider either of those doctors' reports.

■ A properly qualified expert may offer an opinion relating to a subject that is beyond common experience, if that expert's opinion will assist the trier of fact. (Evid. Code, § 801, subd. (a).) Even so, the expert opinion may not be based on assumptions of fact that are without evidentiary support or based on factors that are speculative or conjectural, for then the opinion has no evidentiary value and does not assist the trier of fact. (*Jennings, supra,* 114 Cal.App.4th at pp. 1116–1117.) Moreover, an expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based. (*Kelley, supra,* 66 Cal.App.4th 519; Judicial Council of Cal. Civil Jury Instns. (2003–2004) CACI No. 219 [believability of expert opinion depends on the expert's training and experience, the facts the expert relied on and the reasons for the opinion].)

In this case, both Dr. Katz and Dr. Mar were of the opinion that plaintiff's injury was caused by defendants' negligence in that "more probably than not," plaintiff had been dropped, his arm had been improperly positioned during surgery, or his arm had been stretched. The difficulty that plaintiff encounters in his attempt to avoid summary judgment by relying on the Katz and Mar opinions is that there is no evidence that plaintiff was dropped, that he was improperly positioned, or that his arm was stretched during the procedure or recovery. The doctors assume the cause from the fact of the injury. Dr. Katz's and Dr. Mar's opinions are nothing more than a statement that the injury could have been caused by defendants' negligence in one of the ways they specify. But, "an expert's opinion that something *could* be true if certain assumed facts are true, without any foundation for concluding those assumed facts exist" (*Jennings,* supra, 114 Cal.App.4th at p. 1117), has no evidentiary value. (See *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135 [234 Cal.Rptr. 630].)

In his opposition to the summary judgment motion, plaintiff attempted to support a single fact, which he says shows that he was either improperly positioned during surgery or that he suffered trauma to his shoulder by virtue of his arm being stretched. As noted earlier, he reads the medical records to suggest that although the gall bladder surgery was done while he was in the supine position (lying on his back), he was turned over, at least to some degree, when the surgeons removed the mole on his back. In support of that factual contention, he relies on the operative report that notes the second procedure was "incision of a mole on the right *anterior* side of the abdomen." (Italics added.) But the anterior side of the abdomen is the front of the abdomen, not the back. Thus, the operative report rebuts the single fact on which plaintiff appears to rely.

We recognize that Drs. Katz and Mar declared that plaintiff's shoulder injury occurred "more probably than not" from the events they list in their declaration. But that conclusion is no more than speculation if there is no factual basis for those events. And we note that plaintiff presented no evidence to suggest that an injury such as the one he suffered was rare or unusual in the absence of negligence. Indeed, given Dr. Weber's opinion, it was neither.

■ For the reasons stated, Dr. Katz's and Dr. Mar's declarations were of no evidentiary value on the question of negligence or causation. "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar, supra,* 25 Cal.4th at p. 850.) Plaintiff's evidence in opposition to the motion fails and the motion for summary judgment was properly granted.

## II

### *The Trial Court's Denial of a Continuance*

"If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication or both that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or make any other order as may be just. . . ." (Code Civ. Proc., § 437c, subd. (h).)

In his opposition to summary judgment, plaintiff requested a continuance to conduct further discovery based on the affidavits of Dr. Katz and Dr. Mar, who opined in unison that "[f]urther discovery such [as] depositions of the doctor defendants and hospital staff will be necessary to [p]inpoint whose negligence is responsible for this injury and who fell below the standard of care." Plaintiff's attorney did not file an affidavit, but argued that further discovery had been initiated "to break the conspiracy of silence . . . ."

■ To have been entitled to a continuance, plaintiff was required to show, by affidavit, that facts essential to his opposition to the summary judgment motion existed, and the reasons why they could not be presented at the time of the motion. He failed to do so.

The doctors' affidavits imply without explanation that further discovery will pinpoint those defendants who are guilty of negligence, that is, one presumes, which defendant dropped the plaintiff, or improperly positioned his arm, or stretched his arm in a manner that would cause injury to his shoulder.

The affidavits amount at most to speculation that is contradicted in the medical records to which all parties had access.

Even if the affidavits were deemed reliable enough to suggest that there may have been facts undiscovered at the time to show that defendants, or any of them, had been negligent, the doctors' affidavits do not explain why those facts could not have been presented by the time of hearing on the motion.

This action was filed on May 15, 2000. The summary judgment motion was heard on April 10, 2002. There is no indication in this record that plaintiff initiated any discovery whatsoever during the period of time between the complaint and the motion and certainly no explanation, even outside the required affidavits, of why he could not have conducted the discovery necessary to present the opposition evidence by the time of the hearing.

Plaintiff relies on *Bahl v. Bank of America* (2001) 89 Cal.App.4th 389 [107 Cal.Rptr.2d 270], arguing that a continuance is "virtually mandated upon a good faith showing that a continuance is necessary to obtain facts essential to justify opposition" to a summary judgment motion. Plaintiff is correct that *Bahl* made that observation. For the purpose of this opinion, we need not decide whether it is correct; for assuming that it is, the court's observation does not aid plaintiff here. The virtual mandate to which plaintiff refers presupposes a good faith showing that there are facts in opposition that may exist and a good faith showing why those facts could not have been presented at the time of the hearing. Plaintiff has made neither showing here, and the motion to continue was properly denied.

## DISPOSITION

The judgment is affirmed. Each party shall bear its own costs on appeal.

Davis, J., concurred.

**SIMS, J.,** Concurring and Dissenting.—Plaintiff Bushling went into the defendant hospital for an operation *on his abdomen.*

The morning after the operation, while plaintiff was in the hospital, he experienced pain *in his shoulder.*

Although he has undergone several surgeries on his shoulder, plaintiff has lost the use of his shoulder through nerve damage and is totally disabled.

In moving for summary judgment, the defendants declared that they did nothing wrong. Dr. Weber, who performed subsequent surgery on plaintiff's shoulder, declared that, in his opinion, plaintiff's injury had an "unknown cause."

In response to this showing by the defendants, plaintiff filed the declarations of two physicians. One of them, Ronald Katz, M.D. was the former chairman of the Department of Anesthesiology at both the University of California, Los Angeles (UCLA) and the University of Southern California (USC) Schools of Medicine. At the time of his declaration, he was professor of anesthesiology at both UCLA and USC. Both of plaintiff's experts reviewed all medical records and Dr. Weber's deposition and testified that, to a probability, the kind of injury suffered by plaintiff could not have occurred in the absence of negligence.

The expert testimony set forth in plaintiff's declarations created a triable issue of fact. The trial court erroneously struck these declarations and the majority compound that error. This case should have gone to a jury.

I respectfully dissent.

At the outset, I note that the majority frame the issues on summary judgment by referring frequently to *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*). They do so in part for the proposition that *Aguilar* concluded amendments to the summary judgment statute were designed to liberalize the granting of summary judgment motions.

In my view, *Aguilar, supra,* 25 Cal.4th 826, has nothing to do with the central issue in this case: whether plaintiff's expert declarations should have been considered as reliable evidence. The way in which *Aguilar* liberalized the granting of summary judgment motions was that, for the first time, a defendant could obtain summary judgment by demonstrating that the plaintiff had no evidence by which to prove his case. That is not at issue in this case.

*Aguilar, supra,* 25 Cal.4th 826, did nothing to change the following rules for the adjudication of a summary judgment motion (which the majority fail to acknowledge) as set forth by the California Supreme Court in *Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092 at page 1107 [252 Cal.Rptr. 122, 762 P.2d 46]: "Summary judgment is a drastic measure that deprives the losing party of a trial on the merits. [Citations.] It should therefore be used with caution, so that it does not become a substitute for trial. [Citations.] The affidavits of the moving party should be strictly construed, and those of the opponent liberally construed. [Citations.] Any doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. [Citations.]"

These procedural rules for the review and granting of a motion for summary judgment are designed to preserve the constitutionality of the

summary judgment procedure. As the court recently explained in *Bahl v. Bank of America* (2001) 89 Cal.App.4th 389 at page 395: " 'Though often said, it appears necessary to again reiterate that a summary judgment is a drastic measure which deprives the losing party of trial on the merits.' (*Bunzel v. American Academy of Orthopaedic Surgeons* (1980) 107 Cal.App.3d 165, 169 [165 Cal.Rptr. 433]; see also *Rincon v. Burbank Unified School Dist.* (1986) 178 Cal.App.3d 949, 952 [224 Cal.Rptr. 88].) The right to a jury trial, embodied in article I, section 16 of the California Constitution, is at stake. (See Troutman, *The Jury Trial* (1977) 51 Fla. B.J. 331, 332 [cautioning against too liberal summary judgment as an 'abandonment of the hard-fought principles of our forefathers who believed that no amount of economy and efficiency is adequate consideration for a fair and impartial jury' trial].) Some cases refer to the constitutional rights argument as being a creature of 'older decisions,' because the summary judgment statute (Code Civ. Proc., § 437c) has been held constitutional. (See, e.g., *Scheiding v. Dinwiddie Construction Co.* (1999) 69 Cal.App.4th 64, 70 [81 Cal.Rptr.2d 360].) We agree there is 'nothing in the summary judgment procedure [that] is inherently unconstitutional. [Citations.]' (*Ibid.*) But technical compliance with the procedures of Code of Civil Procedure section 437c is required to ensure there is no infringement of a litigant's hallowed right to have a dispute settled by a jury of his or her peers."

With these ground rules in mind, let us turn to the crux of this case: whether the trial court and the majority have erred by striking the declarations of plaintiff's experts. These declarations are nearly identical, so I will set forth verbatim the declaration of Dr. Katz, as follows:

"I RONALD KATZ M.D., declare:

"1. I am a licensed physician in the State of California and have been practicing anesthesiology for 42 years and I am board certified. I was a professor of anesthesiology and chairmen [*sic*] of the department at UCLA from 1973 to 1990 and professor from 1990 to 1995. I was chairmen [*sic*] of the department and professor of anesthesiology at USC from 1995–2000. I am now professor of anesthesiology at USC and UCLA.

"2. I have reviewed the medical records of Kevin Bushling from Dr [*sic*] Rosson, Fremont Medical center [*sic*], Sutter North, Dr [*sic*] Weber, Dr [*sic*] Vallier , [*sic*] and all surgical Reports and the deposition of Dr [*sic*] Weber. I am familiar with the laparoscopic cholecystectomy performed on Mr [*sic*] Bushling and the injury, Supra Scapula nerve palsy injury that he suffered and the standard of care for anesthesiologists [*sic*] surgeons and hospital staff during and post surgery. It is the duty of the anesthesiologist, as well as the surgeon and hospital staff to safe guard [*sic*] the patient from traumatic and positioning injuries during surgery and post surgery.

"3. I am of the opinion that his injury that [*sic*] Mr. Bushling's condition occurred more probably than not from either a traumatic injury such as dropping the patient or from improper positioning of the patient or stretching of the extremity and but for the negligence of one of his care providers this injury would not have occurred.

"Further discovery such depositions [*sic*] of the doctor defendants and hospital staff will be necessary to Pinpoint whose negligence is responsible for this injury and who fell below the standard of care. Dr [*sic*] Weber is incorrect because there is a wealth of literature describing just such injuries from improper positioning and trauma during surgery.

"I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and within my personal knowledge. If called as a witness, I can competently testify to the facts and opinions stated herein. Executed on March 27, 2002 at Los Angeles California.

"Ronald Katz M.D. Dr [*sic*] RONALD KATZ M.D."

There is something that must be said about this declaration at the outset. It is full of syntactical and grammatical errors. It is the result of sloppy drafting. Its manifest errors create the impression that this is a junk case. However, at oral argument, I asked plaintiff's attorney why the lawyering was so awful. He explained that, at the time of the summary judgment motion, he was undergoing chemotherapy treatment and was extraordinarily debilitated. Indeed, he tried to find another lawyer to take the case for the purpose of opposing the summary judgment motion but was unable to do so. He explained that his opposition to the motion was the best that he could do in the circumstances. I accept this explanation. We must look past the grammatical and syntactical errors in the declaration to examine its substance.

In striking the declaration as conclusory, the trial court relied on *Kelley v. Trunk* (1998) 66 Cal.App.4th 519 [78 Cal.Rptr.2d 122], a decision of Division Seven of the Second District. There, a physician obtained summary judgment in a medical malpractice case based upon a declaration that simply set out the credentials of an expert, recited the history of treatment as set forth in medical reports, and then concluded conclusorily, "At all times . . . Trunk acted appropriately and within the standard of care under the circumstances presented." (*Id.* at p. 522.) The Court of Appeal found the skeletal declaration insufficient to support summary judgment.

*Kelley v. Trunk, supra,* 66 Cal.App.4th 519, was criticized by Division One of the Second District in *Hanson v. Grode* (1999) 76 Cal.App.4th 601 [90 Cal.Rptr.2d 396], where the court said, "The recent case of *Kelley v. Trunk* . . .

suggests that even on summary judgment, an expert's declaration must set forth in excruciating detail the factual basis for the opinion stated therein. We find this approach, under which all of the expert declarations in this case would have to be deemed inadequate, to be unsupported. Accordingly, we decline to utilize it." (*Hanson v. Grode, supra,* 76 Cal.App.4th at p. 608, fn. 6.)

But whatever may be said of *Kelley v. Trunk, supra,* 66 Cal.App.4th 519, it is distinguishable from this case in two important respects. First, the declaration at issue in *Kelley v. Trunk* was used to *obtain* summary judgment, whereas the declarations in the instant case were used to *oppose* summary judgment. Consequently, according to the rule of *Molko v. Holy Spirit Assn., supra,* 46 Cal.3d 1092, the declaration in *Kelley v. Trunk* was to be construed strictly whereas the declarations submitted by plaintiff in the instant case, in *opposition* to the motion, are to be construed liberally. (*Molko v. Holy Spirit Assn., supra,* 46 Cal.3d at p. 1107.)

A second distinction between this case and *Kelley v. Trunk, supra,* 66 Cal.App.4th 519, is that the instant declarations provide enormously more detail than that found in *Kelley v. Trunk.* Thus, for example, in this case, Dr. Katz declared that he had "reviewed [plaintiff's] medical records, . . . all surgical Reports, and the deposition of [Dr. Weber]." He declared further that he was familiar with the surgical procedure performed on plaintiff and with the injury plaintiff suffered. He recounted that the literature did not support Dr. Weber's opinion. And, perhaps most importantly, he ventured an opinion with respect to the specific causes of the injury that occurred to plaintiff, namely, from a traumatic injury such as dropping the patient or from improper positioning of the patient or stretching of the extremity.

In evaluating this declaration, we do not have to set aside our common sense so as to forget that the damage to plaintiff's shoulder first manifested itself on the morning following his abdominal surgery when plaintiff was in the hospital. Thus, when defendants' expert, Dr. Weber, opines that (paraphrasing) "these things just happen," it may be the case that "these things just happen" but the thing that happened to plaintiff just happened to happen when plaintiff was in the hospital for abdominal surgery. This is, of course, a wholly remarkable coincidence.

In evaluating the adequacy of plaintiff's expert declarations, I think we should follow the rule of *Sanchez v. Hillerich & Bradsby Co.* (2002) 104 Cal.App.4th 703 at page 708 [128 Cal.Rptr.2d 529], where, the court, citing *Kelley v. Trunk, supra,* 66 Cal.App.4th 519, said, "It is sufficient, if an expert declaration establishes the matters relied upon in expressing the opinion, that the opinion rests on matters of a type reasonably relied upon, and the bases

for the opinion. [Citation to *Kelley v. Trunk*.]" (*Sanchez v. Hillerich & Bradsby Co., supra,* 104 Cal.App.4th at p. 718.)

Here, Dr. Katz's declaration declared that he had vast experience at both UCLA and USC medical schools, that he had reviewed all medical records and the declaration of Dr. Weber, that he was familiar with the surgical procedure at issue, that he was familiar with the injury sustained, and that, in his experience, this injury would not have occurred absent negligence. He listed various possible causes of the injury. Plaintiff's other expert, Dr. Mar, declared nearly the same thing. In my view, and particularly given the rule of law that requires us to construe these declarations liberally, the declarations of plaintiff's experts plainly contained opinions "reasonably relied upon." They should have been considered on the motion for summary judgment and should have created a triable issue of fact sufficient to defeat summary judgment.

In deciding whether plaintiff's expert declarations should count, we should keep another thing in mind. The cost of litigation these days is nearly prohibitive for most civil cases. The majority's rule will require a full-blown trial of expert views on motions for summary judgment. This will further increase the costs of litigation and will make it harder to settle cases. It will also require trial and appellate judges to wade through more reams of paper. This is all bad.

The declarations of plaintiff's experts established a case of negligence premised on the doctrine of res ipsa loquitur. The elements of that cause of action are: (1) the accident was of a kind that ordinarily does not occur in the absence of negligence; (2) the accident was caused by an instrumentality within the defendant's exclusive control; and (3) was not due to any action by the plaintiff. (*Newing v. Cheatham* (1975) 15 Cal.3d 351, 359 [124 Cal.Rptr. 193, 540 P.2d 33].) These conditions are clearly satisfied in this case where plaintiff had no injury when he entered the hospital, where he was in the care of the hospital the entire time, where he woke up the morning after surgery with an injury to his shoulder, and where plaintiff's experts testified his injury probably did not occur without negligence. "The inference of negligence created by the rule of res ipsa loquitur is in itself evidence." (*Gerhardt v. Fresno Medical Group* (1963) 217 Cal.App.2d 353, 361 [31 Cal.Rptr. 633].)

The declarations of plaintiff's experts created a triable issue of fact that should have gone to the jury on the question whether defendant doctors were negligent in their treatment of plaintiff. (See *Kennedy v. Modesto City Hospital* (1990) 221 Cal.App.3d 575, 580 [270 Cal.Rptr. 544].) I think that the expert doctors on both sides of this case should have to get on the stand and look the jury in the eye and let the jurors decide which theory of the case is more probable.

The "drastic" summary judgment in this case deprived plaintiff of his constitutional right to a jury trial as guaranteed by article I, section 16 of the California Constitution.

I would therefore reverse the summary judgment.

I concur with the majority's conclusion that the trial court properly denied plaintiff's motion for a continuance because plaintiff's counsel failed to submit an affidavit, which is a procedural requisite to granting a continuance under the summary judgment statute. (*Mahoney v. Southland Mental Health Associates Medical Group* (1990) 223 Cal.App.3d 167, 170 [272 Cal.Rptr. 602]; *American Continental Ins. Co. v. C & Z Timber Co.* (1987) 195 Cal.App.3d 1271, 1280 [241 Cal.Rptr. 466].)