Filed 9/9/14  Lammon v. Smith CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| DENNIS LAMMON et al.,<br><br>    Plaintiffs and Appellants,<br>v.<br><br>TIMOTHY SMITH,<br><br>    Defendant and Respondent. | A139335<br><br>(Napa County<br>Super. Ct. No. 26-59419) |

Suzanne Lammon died from acute bacterial pharyngitis less than two days after being seen and treated for a sore throat in a hospital emergency department. Her relatives sued the hospital and two emergency room physicians for medical malpractice. One of the treating emergency room doctors moved for summary judgment. The trial court found a declaration submitted by one of plaintiffs' medical experts inadmissible under Health and Safety Code section 1799.110, subdivision (c) (hereafter section 1799.110(c)). The trial court also held that the plaintiffs' expert evidence in total, even considering the inadmissible declaration, failed to establish the necessary elements of a medical malpractice claim. The plaintiffs argue the court misconstrued section 1799.110(c). Since we agree that plaintiffs failed to meet their burden to establish a triable issue regarding causation, we need not address the statutory interpretation question.

## I.    BACKGROUND

Suzanne Lammon died on July 11, 2011. In July 2012, her husband and children (Plaintiffs) filed a medical malpractice action against Timothy S. Smith, D.O., Andrew C. Nothmann, M.D. (and Andrew C. Nothmann, M.D., Inc.), and Queen of the Valley

1

Medical Center (Hospital) alleging the defendants negligently provided medical care to Lammon on and after July 8, 2011, causing her death, and failed to obtain her informed consent to the medical care. All defendants but Smith were later dismissed from the action.

Smith moved for summary judgment. The parties' statements of undisputed material facts are sparse. Therefore, most of the following facts are taken from the evidence submitted in support and in opposition to the motion, with all reasonable inferences drawn in favor of Plaintiffs.

A.    *Medical Evidence*

On July 8, 2011, at about 5:35 p.m., Lammon went to the Hospital's emergency department complaining of a swollen throat and fever. She was examined and treated by Nothmann. Hospital medical records of the visit state that Lammon presented with "a bilateral sore throat with symptoms beginning 2 days prior to arrival. There has been a recurrent high fever, no earache, no nasal discharge, no headache and no cough. The patient has noted bilateral cervical lymphadenopathy [(i.e., a swollen neck)]. The patient reports 8/10, aching throat pain. She has noted some hoarseness. She denies neck stiffness. She has taken ibuprofen with some improvement . . . . There has been no difficulty breathing. There has been associated difficulty swallowing secondary to pain." She reported no shortness of breath, chest pain or palpitations, abdominal pain, vomiting or diarrhea, but some nausea. She was a smoker but had no other remarkable medical history.

Notes of Nothmann's physical exam disclosed the following. Lammon appeared well developed and nourished, nontoxic, and alert. Her temperature was 102.1 degrees Fahrenheit and her pulse was 118 beats per minute. She had no nasal congestion or discharge. In her throat, she had minimal pharyngeal injection (congestion) and tonsillar edema (swelling), no exudates (fluid accumulation), peritonsillar abscess (collection of pus), depression of the soft palate or trismus (difficulty opening the mouth and jaw), and her airway was open. Her neck was supple without meningismus and with midline trachea. In her lymphatic system, there were palpable bilateral, anterior and cervical

2

nodes with tenderness.  Her lungs were clear to auscultation and her breath sounded equal.

Nothmann ordered a "rapid strep screen," which came back negative, a result that was confirmed with a followup throat culture.  He diagnosed her with acute viral pharyngitis, "commonly known as 'Sore Throat,' " and prescribed Motrin, Percocet and Zofran.  She was discharged at 7:06 p.m. in stable condition and instructed to return immediately if she had increased difficulty breathing or swallowing or other specified symptoms.

Lammon returned to the Hospital's emergency department the next morning, on July 9, 2011, and was seen and treated by Smith.  Smith averred that he consulted the record of Lammon's emergency department visit the previous day.  Hospital medical records state that Lammon presented with "shortness of breath with excessive phlegm production beginning 1 day prior to arrival.  There has been white/blood-tinged sputum, productive coughing and previous fever.  Patient was seen here yesterday and diagnosed with viral pharyngitis.  There has been associated wheezing.  There has been an associated sharp anterior/pleuritic chest pain associated with coughing.  There is no prior history of asthma."

In Smith's initial notes, the description of his physical examination of Lammon was identical to the description of Nothmann's physical examination of Lammon on July 8, 2011.  On July 25, however, Smith wrote an addendum to his notes that provided a new description of the physical examination.  In his declaration submitted in support of his summary judgment motion, he averred:  "During my charting for the July 9th patient encounter, I cloned the chart from the day prior including Dr. Nothmann's report of Social History, Current Medications, Allergies, and Physical Exam.  This act of cloning Dr. Nothmann's physical exam was done inadvertently.  After learning of [Lammon's] death, I reviewed the [Hospital] medical records and made an addendum to [the Hospital's] July 9, 2011 emergency report."  The addendum includes the comment, "Chart cloning air [*sic*] noted on chart review, addendum inserted for accurate history."

3

The addendum provided the following description of Smith's July 9, 2011 physical examination of Lammon. "Triage vital signs temperature 99, pulse 104, . . . respiratory rate 20 . . . ." There was no nasal discharge or bleeding. In her throat, he noted "[p]harynx without injection. Airway patent. Voice quality without hoarseness or stridor." The neck was supple and nontender. As to her lymphatic system, he noted "[n]o gross adenopathy in the anterior cervical chain." As to her lungs, he noted bilateral expiratory wheezes. She had tachycardia.

Smith ordered respiratory therapy for Lammon. After two and one-half hours, her symptoms had improved but she was still wheezing, so Smith ordered further respiratory therapy including administration of a corticosteroid. He also ordered a chest x-ray, which was interpreted by a radiologist as showing a normal silhouette with clear lungs and no signs of acute disease. Smith diagnosed Lammon with acute viral pharyngitis, acute asthma/bronchospasm and dehydration. He prescribed albuterol and prednisone and advised her to stop using Motrin (ibuprofen) and stop smoking. She was discharged at about 10:40 a.m. with discharge instructions for viral pharyngitis, asthma and bronchitis with wheezing. A nurse following up on the July 8 visit, noted that Lammon had returned to the emergency room where she received fluids, breathing treatment, and steroid medication, and reported feeling better.

On July 11, 2011, at 9:45 a.m., Lammon was found dead in her bed. She had last been seen alive the previous night at 10:30 p.m. The coroner declared the cause of death "complications of acute bacterial pharyngitis." The autopsy report cited the following evidence (in addition to Lammon's clinical history) as support for the finding: cervical lymphadenopathy, acute bacterial pharyngitis and epiglottitis, acute necrotizing fasciitis and myositis, prevertebral fasciitis, acute necrotizing mediastinitis and epicarditis/pericarditis, bilateral empyema, marked acute bronchopneumonia, acute spenitis consistent with sepsis, and visceral congestion.

B.    *Expert Opinions*

In support of his summary judgment motion, Smith submitted the expert opinion of David A. Talan, M.D., a practicing and board-certified emergency medicine physician

4

and emergency medicine department chairman of the medical school at the University of California, Los Angeles. Based on his review of Lammon's July 8 and 9, 2011 Hospital medical records, the coroner's records (including the autopsy report), the declarations of Nothmann and Smith, and the complaint, he opined that Smith's (as well as Nothmann's) treatment of Lammon was within the standard of care for an emergency medicine physician and was not a substantial factor in causing her death.

In opposition to the summary judgment motion, Plaintiffs submitted two expert declarations. The first was the opinion of Hugh H. West, M.D., a practicing and board-certified emergency medicine physician. He opined that Smith's treatment of Lammon fell below the standard of care for emergency medicine. "Lammon's complaints of pleuritic chest pain, tachycardia, shortness of breath and hemoptysis [(coughing up blood)[1]] are classic signs and symptoms of pulmonary embolism [(blockage of one or more pulmonary arteries)[2]]. [Smith] did not include pulmonary embolism on his differential diagnosis[, which was] below the standard of care. [¶] . . . Had [Smith] included pulmonary embolism on the differential diagnosis, [Lammon] would have required the appropriate work up for pulmonary embolism. [¶] . . . Since [Lammon] was a smoker, with a history of COPD [(chronic obstructive pulmonary disease)[3]] pleuritic chest pain, tachycardia, shortness of breath and hemoptysis, the standard of care to evaluate for pulmonary embolism would have been a CT scan of the chest with contrast (CT PE protocol). A CT scan of [Lammon's] chest would have revealed her pathology which would have led to the correct diagnosis and [Lammon] would have received the

---

[1] Mayo Foundation for Medical Education and Research, *Symptoms: Coughing Up Blood* (May 8, 2012) <http://www.mayoclinic.org/symptoms/coughing-up-blood/basics/causes/sym-20050934> (as of Sept. 9, 2014).

[2] Mayo Foundation for Medical Education and Research, *Diseases and Conditions: Pulmonary Embolism* (Jan. 2, 2014) <http://www.mayoclinic.org/diseases-conditions/pulmonary-embolism/basics/definition/con-20022849> (as of Sept. 9, 2014).

[3] Mayo Foundation for Medical Education and Research, *Diseases and Conditions: COPD* <http://www.mayoclinic.org/diseases-conditions/copd/basics/definition/con-20032017> (as of Sept. 9, 2014).

appropriate medical treatment.  [Smith's performance] fell below the standard of care by failing to order a CT scan of the chest. [¶] . . . [Lammon's] complaints of chest pain and shortness of breath and tobacco use were also compatible with acute coronary syndrome. [Smith] did not include acute coronary syndrome [(any condition brought on by sudden reduced blood flow to the heart)[4]] in his differential diagnosis[, which] . . . fell below the standard of care for emergency medicine. [¶] . . . [Lammon's] second visit to the emergency department occurred 12 hours after she was discharged.  A repeat visit in such a short time frame is a red flag and this should have been an indication to [Smith] that [Lammon] was suffering from a more serious illness than a viral sore throat."  West offered no opinion as to whether the departure from the standard of care was a substantial factor in Lammon's death.

Plaintiffs' second declaration was written by Richard A. Jacobs, M.D., a board-certified physician in internal medicine who specialized in infectious disease.  Based on his review of the Hospital medical records, the coroner's report, West's declaration and Smith's deposition testimony, he opined:  "If [Lammon] would have been admitted to [the Hospital] on July 9, 2011, she would have received additional diagnostic testing that would have revealed an infectious process that would have prompted institution of broad spectrum antibiotics[.]  Had antibiotics been administered on July 9, 2011 it is my professional opinion that [Lammon] would have survived since the infection was in its early stage and was reversible.  Thus, the failure to admit [Lammon] to [the Hospital] for further evaluation and treatment was a substantial factor in causing her death."  He did not opine that failure to admit Lammon was a departure from the applicable medical standard of care.

---

[4] Mayo Foundation for Medical Education and Research, *Diseases and Conditions: Acute Coronary Syndrome* (May 7, 2013) <http://www.mayoclinic.org/diseases-conditions/acute-coronary-syndrome/basics/definition/con-20033942> (as of Sept. 9, 2014).

C.      *Summary Judgment Arguments and Objections to Evidence*

Smith argued that Talan's declaration demonstrated that Smith's performance did not fall below the applicable standard of care and was not a substantial factor in causing Lammon's death.  The burden of proving a triable issue of fact, therefore, shifted to Plaintiffs, who needed to produce medical expert testimony raising such an issue.

In opposition, Plaintiffs argued West's declaration raised a triable issue on whether Smith breached the standard of care and Jacobs's declaration raised a triable issue on causation.  They did not address Talan's declaration.  Smith objected to and moved to strike the declarations of West and Jacobs.  He argued both declarations were inadmissible under section 1799.110(c), which provides:  "In any action for damages involving a claim of negligence against a physician and surgeon providing emergency medical coverage for a general acute care hospital emergency department, the court shall admit expert medical testimony only from physicians and surgeons who have had substantial professional experience within the last five years while assigned to provide emergency medical coverage in a general acute care hospital emergency department."[5]  Smith also objected to the declarations as speculative and lacking in foundation.

In his reply, Smith argued that Plaintiffs had failed to produce admissible emergency medicine expert testimony raising triable issues of fact.  In addition to the section 1799.110(c) admissibility issue, he argued the expert opinions did "not show a causal link between the alleged breaches of the standard of care by Dr. Smith and . . . Lammon's death.  In his declaration, Dr. West . . . opines that Dr. Smith breached the standard of care by:  (1) failing to consider pulmonary embolism and acute coronary syndrome in his differential diagnosis; and (2) failing to order a CT scan of . . . Lammon's chest.  [Citation.] . . . In Dr. Jacobs' declaration, he . . . opines that the failure

---

[5] The subdivision further provides:  "For purposes of this section, 'substantial professional experience' shall be determined by the custom and practice of the manner in which emergency medical coverage is provided in general acute care hospital emergency departments in the same or similar localities where the alleged negligence occured [*sic*]."  (§ 1799.110(c).)

to admit . . . Lammon to the hospital for further evaluation and treatment was a substantial factor in causing her death. [Citation.] . . . Dr. Jacobs does not opine that the breaches of the standard of care identified by Dr. West were substantial factors in causing . . . Lammon's death. [Citation.]"

In a "supplemental opposition," Plaintiffs argued that section 1799.110(c) applied to expert testimony on the standard of care, but not expert testimony on causation. They argued West satisfied the section 1799.110(c) criteria, referencing a supplemental declaration by West regarding his professional experience in emergency medicine. Thus, both declarations were admissible. Plaintiffs further argued that the two declarations established that Smith's breach of care was a significant factor in Lammon's death.

Smith objected to the supplemental opposition and declaration and asked the court to strike the papers. He again argued that Plaintiffs' interpretation of section 1799.110(c) was incorrect, and that Plaintiffs' declarations in any event did not establish that a breach of care by Smith was a substantial factor in causing Lammon's death. Specifically, he noted that Jacobs opined that the failure to admit Lammon and give her antibiotics contributed to her death; however, neither West nor Jacobs opined that the failure to admit Lammon or give her antibiotics was a breach of the applicable standard of care.

D.    *Trial Court Ruling*

The trial court sustained Smith's objection to Jacobs's declaration on the ground that Jacobs did not satisfy the criteria of section 1799.110(c). The court overruled all objections to West's declaration and granted summary judgment to Smith.

Talan's declaration, the court explained, "establishes that [Smith's] care and treatment of . . . Lammon . . . did not fall below the standard of care and/or was not a substantial factor in causing her death. [¶] Plaintiffs have failed to meet their burden of showing that a triable issue of material fact exists as to whether any alleged breaches of the standard of care by [Smith] were substantial factors in causing . . . Lammon's death." "Dr. West . . . opines that [Smith] breached the standard of care by:  (1) failing to consider pulmonary embolism and acute coronary syndrome in his differential diagnosis; and (2) failing to order a CT scan of . . . Lammon's chest.  Dr. West does not opine that

8

any of these alleged breaches were a substantial factor in causing . . . Lammon's death. In Dr. Jacobs' declaration, he . . . opines that the failure to admit . . . Lammon to the hospital for further evaluation and treatment was a substantial factor in causing her death. . . . [T]he declaration of Dr. Jacobs is inadmissible . . . pursuant to [section 1799.110(c)]. Even if the court were to consider Dr. Jacobs' declaration, Dr. Jacobs does not opine that the breaches of the standard of care identified by Dr. West were substantial factors in causing . . . Lammon's death. [Citation.]"

## II.    DISCUSSION

Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fns. omitted.) In ruling on the motion, the court must draw all reasonable inferences from the evidence in the light most favorable to the opposing party. (*Id.* at p. 843.) When the plaintiff bears the burden of proving facts by a preponderance of the evidence and the defendant moves for summary judgment, the defendant "must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not . . . ." (*Id.* at p. 851.) That is, the defendant must present facts that negate an essential element of the plaintiff's cause of action or establish a complete defense to the claim. (Code Civ. Proc., § 437c, subd. (p)(2); *Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 304.) Only if the defendant meets this burden does the burden shift to the plaintiff to demonstrate the existence of triable material facts.[6] (*Johnson v.*

---

[6] Plaintiffs argue for the first time in their appellate reply brief that Talan's expert testimony was insufficient to meet Smith's initial burden on the summary judgment motion and to shift the burden to Plaintiffs. We do not address issues raised for the first

9

*Superior Court,* at p. 305.) We review an order granting summary judgment de novo. (*Aguilar v. Atlantic Richfield Co.*, at p. 860.)

"The elements of a cause of action for medical malpractice are: (1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage. [Citation.]" (*Johnson v. Superior Court, supra,* 143 Cal.App.4th at p. 305.) "In any action for damages involving a claim of negligence against a physician and surgeon arising out of emergency medical services provided in a general acute care hospital emergency department, the trier of fact shall consider, together with all other relevant matters, the circumstances constituting the emergency, as defined herein, and the degree of care and skill ordinarily exercised by reputable members of the physician and surgeon's profession in the same or similar locality, in like cases, and under similar emergency circumstances." (Health & Saf. Code, § 1799.110, subd. (a).)

In a medical malpractice case, expert testimony is required to prove or disprove performance within the standard of care unless the defendant's negligence is obvious to a lay person. (*Johnson v. Superior Court, supra,* 143 Cal.App.4th at p. 305.) Plaintiffs "also must show that [*a defendant's*] *breach of the standard of care was the cause, within a reasonable medical probability, of his injury.* [Citation.]" (*Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 509, italics added.) Under section 1799.110(c), "the court shall admit expert medical testimony only from physicians and surgeons who have had substantial professional experience within the last five years while assigned to provide emergency medical coverage in a general acute care hospital emergency department." The parties dispute whether this statutory restriction

---

time on appeal or for the first time in a reply brief. (See *Ward v. Taggart* (1959) 51 Cal.2d 736, 742; *REO Broadcasting Consultants v. Martin* (1999) 69 Cal.App.4th 489, 500.)

10

applies only to expert medical opinions on the standard of care or to any expert medical opinions offered in the action, including on the issue of causation.[7]

We need not resolve this issue of statutory interpretation because we agree with the trial court that, even assuming Jacobs's declaration to be admissible, Plaintiffs failed to raise a triable factual dispute about whether a breach of the emergency room duty of care by Smith caused Lammon's death. There is a pronounced disconnect between the opinions offered by West and Jacobs. As the trial court noted, West opined that Smith breached the standard of care by failing to consider pulmonary embolism and acute coronary syndrome in his differential diagnosis, which would have caused him to order a CT scan. He does not opine that consideration of those diagnoses or administration of a CT scan would have caused Smith to admit Lammon to the Hospital. Nor is such a result readily inferable from the evidence in the record. The coroner found that Lammon died of acute bacterial pharyngitis, not blood flow problems, and it is not self-evident that treatment for the latter would have cured or brought to light the former. Jacobs opines that Lammon's life would have been saved had she been admitted to the Hospital and administered broad spectrum antibiotics. Neither West nor Jacobs opines that hospital admission or antibiotics would have been the appropriate medical treatment for pulmonary embolism or acute coronary syndrome, nor is such an inference supported by the record. Plaintiffs simply failed to produce evidence that any negligence in Smith's treatment of Lammon was a substantial factor in causing her death. Therefore, the trial court properly granted summary judgment to Smith.

### III.  DISPOSITION

The judgment is affirmed. Plaintiffs shall pay Smith's costs on appeal.

---

[7] Plaintiffs also argue that Smith failed to establish that the Hospital was "a general acute care hospital emergency department" within the meaning of the statute. This factual argument is forfeited because Plaintiffs failed to raise it in the trial court. (See *Ward v. Taggart, supra,* 51 Cal.2d at p. 742.)

11

_____
Bruiniers, J.

We concur:


_____
Simons, Acting P. J.


_____
Needham, J.