Filed 12/20/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>YOSEF SHAVUII BENDOVID,<br><br>    Defendant and Appellant. | 2d Crim. No. B288633<br>(Super. Ct. No. 17PT-00942)<br>(San Luis Obispo County) |

Mentally disordered offenders (MDO's) committed for treatment lose their freedom.  Courts must ensure strict compliance with statutory requirements to guarantee that commitments are not arbitrary and comport with due process.

Yosef Shavuii Bendovid appeals an order committing him for treatment as an MDO pursuant to Penal Code section 2962.[1] We conclude, among other things, that Bendovid did not receive 90 days of treatment for his disorder "within the year" prior to his "parole or release."  (§ 2962, subd. (c).)  We reverse.

_____

[1] All statutory references are to the Penal Code.

FACTS

In 2015, Bendovid was convicted of assault with force likely to produce great bodily injury (§ 245, subd. (a)(4)) and sentenced to two years in state prison. In August 2017, the Board of Parole Hearings (BPH) classified Bendovid as an MDO. (§ 2962.)

On November 7, 2017, Bendovid challenged the BPH determination in court (§§ 2962, 2966, subd. (b)), and waived his right to a jury trial.

Meghan Brannick, a forensic psychologist at Atascadero State Hospital (ASH), testified Bendovid has a "delusional disorder," which qualifies as a severe mental disorder. His disorder was an "aggravating factor" in his commitment offense of assault, which he committed at a church where he was not a member of the congregation. His actions were "odd and unprovoked." In committing the crime, he had the delusional belief that he was a "Prince of Israel." His statements "made in subsequent e-mails" showed his "delusional thought processes."

Brannick testified Bendovid's mental disorder is not in remission and "could not be kept in remission without treatment." As of the date of the BPH hearing, Bendovid posed "a substantial risk of physical harm to others by reason of his severe mental disorder." He has a history of "violent and aggressive behavior." When she interviewed him, he showed a "limited insight into his disorder and need for treatment." He has a history of "treatment noncompliance."

Bendovid first received treatment for his mood disorder in jail, and then in prison from June 5, 2017, to August 18, 2017. He was prescribed Risperdal and Depakote. Risperdal is an "antipsychotic medication" prescribed for "psychotic symptoms."

2

His treatment in prison was not long enough to satisfy the 90-day treatment requirement.

Brannick testified the jail medical records revealed that Bendovid was "suicidal" over his fear of being sent to prison. Bendovid was prescribed Abilify in jail. Abilify is an "antipsychotic medication with mood stabilizing benefits." It was administered by shots "every four weeks," beginning April 5, 2017, and ending May 21, 2017. Brannick testified this shows he was "undergoing treatment for a mental health issue" in jail. In jail Bendovid also received Depakene, the liquid form of Depakote. Depakene is "another mood stabilizing medication."

The People introduced the jail medical records, which reflect Bendovid was diagnosed for mood and personality disorders in jail, not for a delusional disorder. Brannick said the jail authorities and ASH diagnosed Bendovid with different disorders.

Bendovid claimed the People could not prove 90 days of treatment because the jail authorities had not diagnosed him for his delusional disorder which was his severe mental disorder. Nevertheless, the trial court found Bendovid met the criteria for an MDO commitment.

DISCUSSION

*90 Days of Treatment Requirement*

Bendovid contends there is insufficient evidence that he received 90 days of treatment for his severe mental disorder.

" ' "To be substantial, the evidence must be ' "of ponderable legal significance . . . reasonable in nature, credible and of solid value." ' " ' " (*People v. Wright* (2016) 4 Cal.App.5th 537, 545.)

For an MDO commitment, the defendant must receive 90 days of treatment for his or her severe mental disorder "in the

3

year before being paroled." (*People v. Sheek* (2004) 122 Cal.App.4th 1606, 1610; § 2962.)  Proof that the defendant has a severe mental disorder that was not in remission and the other MDO factors in section 2962 will not authorize a commitment unless the People prove the 90-day treatment requirement. (*Ibid.*)[2]

Bendovid does not dispute that he received 75 days of treatment in prison.  But he claims he did not receive treatment for his delusional disorder in jail before he was sent to prison. The People contend the trial court could reasonably find that he received at least 15 days of treatment for that disorder while in jail.

But the prosecutor told the trial court that jail records show "there's a diagnosis of unspecified mood disorder."  He did not claim there was a diagnosis for the delusional disorder in the jail records.  The delusional disorder is the severe mental disorder in this case.

The jail medical records, which the People introduced into evidence to prove treatment, show:  1) that on April 5, 2017, Bendovid was diagnosed with an "unspecified mood disorder" and

---

[2] "An offender is eligible for commitment under the MDO Act if all of the following six factors are met:  (1) the prisoner has a severe mental disorder; (2) the prisoner used force or violence in committing the underlying offense; (3) the prisoner had a disorder which caused or was an aggravating factor in committing the offense; (4) the disorder is not in remission or capable of being kept in remission in the absence of treatment; (5) the prisoner was treated for the disorder for at least 90 days in the year before being paroled; and (6) because of the disorder, the prisoner poses a serious threat of physical harm to other people." (*People v. Sheek, supra,* 122 Cal.App.4th at p. 1610.)

4

an "unspecified personality disorder"; 2) he was treated for these disorders until May 20, 2017, in jail; 3) the final diagnosis was that he had those two disorders; and 4) the jail's May 20, 2017, medical transfer document to state prison lists those same two diagnosed disorders.

Bendovid notes the jail records do not show a diagnosis for a delusional disorder. The jail medical authorities did not state that they were treating him for such a disorder or that they saw evidence that he had delusions. "The MDO [Act] requires the district attorney to accept the diagnosis and prognosis of the physicians at the treating facility . . . ." (*Cuccia v. Superior Court* (2007) 153 Cal.App.4th 347, 355.) Here the relevant treating facility was the county jail.

The People concede that the jail medical authorities *did not diagnose* Bendovid as having a "delusional disorder." The diagnosis for that disorder occurred later. Brannick said Bendovid "started treatment on June 5, 2017" for his delusional disorder in prison. He received treatment there until August 18, 2017. But that prison treatment period is less than 90 days.

Brannick acknowledged that the jail, prison and ASH medical authorities had made *different diagnoses* of Bendovid's mental disorders. She said, "[T]he diagnosis that's best identified at the San Diego Sheriff's Department, I don't believe *needs to be consistent* with [the] diagnosis we've rendered at [ASH]." (Italics added.)

But the different diagnoses meant Bendovid was being diagnosed and treated for a different disorder in prison than the two disorders he was diagnosed and treated for in jail. To establish treatment for the 90-day requirement, the People must prove the defendant "was diagnosed" for the severe mental

5

disorder during the relevant treatment period. (*People v. Sheek*, *supra*, 122 Cal.App.4th at p. 1611.)

The People nevertheless suggest the absence of a delusional disorder diagnosis in jail should not change the result on the 90-day treatment issue.

Bendovid responds, "[T]he notion that jail officials would 'treat' a prisoner for a mental disorder that the People concede *was never diagnosed* . . . is absurd . . . ." The word "absurd" aside, there is merit to this claim.

The diagnosis determines the treatment the patient receives. (American Psychiatric Assn., Diagnostic & Statistical Manual of Mental Disorders (5th ed. 2013), p. 5 (DSM-5.) For involuntary hospitalizations, the "therapeutic process" begins with observation and the "diagnosis to determine whether treatment is required." (*In re Curry* (D.C. Cir. 1971) 452 F.2d 1360, 1363, fn. 3.)

In MDO cases where the treating doctors have not diagnosed the severe mental disorder, there is insufficient evidence to support a finding that they treated the defendant for that disorder. (*People v. Sheek*, *supra*, 122 Cal.App.4th at p. 1611 [a 90-day treatment finding could not be sustained where the treating doctors did not diagnose the disorder and its discovery occurred after the relevant treatment period]; see also *People v. Garcia* (2005) 127 Cal.App.4th 558, 567 ["Department had not diagnosed defendant with" the severe mental disorder, "[t]herefore, defendant had not been treated for [it]"].)

The court had no basis to find Bendovid was treated for the disorder that was relevant to his commitment. (*People v. Sheek*, *supra*, 122 Cal.App.4th at p. 1611.) "[I]t is hard to see how a doctor can provide treatment 'for' a condition without knowing

6

what that condition is or that it even exists." (*Lawson v. Fortis Ins. Co.* (3d Cir. 2002) 301 F.3d 159, 165; *Van Volkenburg v. Continental Cas. Ins. Co.* (W.D.N.Y. 1996) 971 F.Supp. 117, 122 ["plaintiff reasonably argues that to obtain advice or treatment regarding a medical 'condition,' you must first have some awareness that the 'condition' exists"]; *Scarborough v. Aetna Life Ins. Co.* (Tex. 1978) 572 S.W.2d 282, 284 [medical treatment means treatment "directed toward a known condition"]; *Craig v. Central National Life Insurance Co.* (Ill.Ct.App. 1958) 148 N.E.2d 31, 36 ["the origin of plaintiff's sickness was the date upon which [the doctor] diagnosed the same"].)

The People note Brannick testified Bendovid received medication for "significant mental health symptoms" in jail. They suggest her testimony relying on the antipsychotic medications he received in jail is sufficient.

But the issue is not what medications Bendovid received; it is what disorders he was treated for. Brannick conceded that Bendovid had not been diagnosed in jail for a delusional disorder. She said the two medications he received there, Abilify and Depakene, have "*mood* stabilizing" benefits. (Italics added.) The prosecutor said the jail records show he was diagnosed as having a "*mood* disorder." (Italics added.)

But the issue is not treatment for a mood disorder; it is treatment for the delusional disorder. Brannick relied on the jail medical records as her source of information about what Bendovid was treated for. But she was not able to point to any portion of those detailed records to show any notation by the jail doctors that they medicated him to treat a delusional disorder.

Mood and personality disorders are some of the more common mental disorders. (*Kansas v. Crane* (2002) 534 U.S. 407,

7

412 ["40%-60% of the male prison population is diagnosable with Antisocial Personality Disorder"].)  "Depression or mood disorders are the most common reasons people seek mental health treatment."  (Tunick, *Major Depression* (2009) West Virginia Lawyer 48, at p. 2; DSM-5, *supra*, at p. 824 ["mood" involves a "pervasive and sustained emotion," which may include depression or anxiety]; *People v. Robinson* (1999) 72 Cal.App.4th 421, 427-428 [a personality disorder is a mental illness but some doctors do not view it as "a major mental disorder"].)  A personality disorder involves "impairment in personality functioning," difficulties in "identity, self-direction, empathy, intimacy," a "wide range of negative emotions," and the inability to get along with others.  (DSM-5, at p. 770.)

By contrast, "[t]he diagnosis of Delusional Disorder refers to a specific mental illness" which is "uncommon."  (*United States v. Ruiz-Gaxiola* (9th Cir. 2010) 623 F.3d 684, 688, fn. 1.)  It involves the "presence of one (or more) delusions with a duration of 1 month or longer."  (DSM-5, *supra*, at p. 90.)  Its "diagnostic criteria" is unique, including a "disturbance" which "is not attributable to the psychological effects of a substance or another medical condition and is not better explained by another mental disorder . . . ."  (*Ibid.*)

Brannick testified Bendovid received Abilify and Depakene.  But those are medications commonly used to treat mood disorders.  (*Carson v. Berryhill* (S.D.Tex. 2018) 286 F.Supp.3d 818, 821, fn. 7; *Miskovitch v. Hostoffer* (W.D.Pa. 2010) 721 F.Supp.2d 389, 398 ["Depakene, a mood stabilization drug"]; see also *In re R.V.* (2015) 61 Cal.4th 181, 215 [citing expert testimony that Abilify "is typically used for the treatment of mood

8

disorders"].) Brannick's testimony confirmed the mood stabilizing benefit of these drugs.

But treating a delusional disorder involves greater challenges because this disorder is often resistant to treatment by medications. (*United States v. Ruiz-Gaxiola, supra*, 623 F.3d at p. 701, fn. 11; *United States v. Bush* (4th Cir. 2009) 585 F.3d 806, 817; *United States v. Ghane* (8th Cir. 2004) 392 F.3d 317, 319.) Consequently, the progress notes of a doctor treating this disorder should contain notations on how the medications are impacting the delusional thoughts or the side effects on a delusional patient. (See, e.g., DSM-5, *supra*, at p. 90; *United States v. Gillenwater* (9th Cir. 2014) 749 F.3d 1094, 1104.)

But the jail treatment progress notes do not contain such references. Instead, they reflect: 1) treatment for Bendovid's fear that "prison is dangerous," 2) assessment of "his emotional stage" and his request for "emotional support," 3) concerns about him becoming "depressed or anxious," 4) his progress in "focusing in the future and feeling positive at the fact that his 2 [year] sentence is at 80% and he has already 500 [plus] of time served credit," 5) monitoring of his "good attitude," his "smiling and laughing at appropriate times," 6) monitoring of his progress in "being less scared about going to prison," 7) guidance to him on "better decision making skills," and 8) continuation of "supportive therapy" to "maintain his suicidal risk low." They reflect that he was "stable" on his current medication regimen, his "mood" was "alright, " and he "tolerated treatment well."

Brannick was not a treating doctor. She interviewed Bendovid for only 45 minutes. The jail doctors said Bendovid had suicidal thoughts. Brannick said she could not say "for sure" whether those "suicidal ideations" were related to "distress

9

caused by his qualifying disorder," because she "wasn't treating him at this time." She said "suicidal ideation" is "not a component of delusional disorder specifically." Bendovid's counsel claimed his suicidal ideations were unrelated to any delusional disorder. The jail doctors determined the cause of his suicidal mood was his fear of going to prison. Counsel referred to those records and asked Brannick, "Does that sound like a delusion?" She responded, "That doesn't sound like a delusion to me."

Brannick did not have complete knowledge of the jail medical records. An April 5th medical document contained the jail doctors' diagnoses. When asked if that document was Bendovid's "psych screening," Brannick said, "I don't know if it's his psych screen or not." She did not know how the jail "documents their notes." She did not claim she had ever contacted the jail doctors to learn the foundational facts for his diagnosis and treatment listed in their medical charts.

When asked if the jail doctors were treating Bendovid because of his mood of wanting to commit suicide, Brannick said, "*I'm not sure that's what the entirety of his treatment was* related to given the medication that he's prescribed." (Italics added.) She speculated that because he received Abilify and Depakene, he may have been treated for something other than what the jail doctors said he was treated for.

But an expert's "speculation is not evidence" and it cannot support "an involuntary commitment." (*People v. Wright*, *supra*, 4 Cal.App.5th at p. 546.) Brannick's speculation had "no evidentiary value." (*Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 510.) She provided no "reasoned explanation" regarding how receiving the two drugs to treat his

diagnosed disorders meant that he was treated for something else, and she was not able to identify that something else. (*Ibid.*) The source for her claims was the jail treatment records, but they provided no foundational facts to support her conclusion. (*Ibid.*) A medical opinion based solely on a " ' "guess, surmise or conjecture" ' " does not suffice. (*In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1504.) Moreover, as Bendovid notes, Brannick confirmed that the two drugs he received in jail were for mood disorders, which is exactly what the jail doctors said he was being treated for.

In the People's case in chief, the prosecutor did not ask Brannick if Bendovid was treated for a delusional disorder in jail. He avoided the key issue and only asked whether Bendovid was "undergoing treatment for a mental health issue." Brannick's affirmative answer to this question was not sufficient. Her responses that Bendovid was treated for "a mental health issue" or "mental health symptoms" were ambiguous and irrelevant. She was not able to specifically testify that he was treated for his delusional disorder, which is the relevant issue. The People may not rely on ambiguity in place of evidence (*People v. Alkow* (1950) 97 Cal.App.2d 797, 803), and there is no substantial evidence where the expert relies on speculation. (*People v. Wright*, *supra*, 4 Cal.App.5th at pp. 545-546.)

"An individual's right to liberty is too sacred a premise of our ordered democracy . . . to have it rendered almost meaningless by a cursory interview, brief review of medical charts and an inconclusive, tentative conclusion." (*In re MH 2007-001236* (Ariz.Ct.App. 2008) 204 P.3d 418, 427.)

The jail doctors were the treating doctors. Their medical records constitute the evidence that unequivocally shows what

11

they treated him for.  (§ 2981; *Gunn v. Employment Development Dept.* (1979) 94 Cal.App.3d 658, 664, fn. 6 [there is "no better evidence of the state of one's health" than the opinion of the treating doctor].)  The jail medical records are the "reliable and trustworthy" record of his treatment there.  (*Loper v. Morrison* (1944) 23 Cal.2d 600, 608.)  Those records show the medications they used were to treat the mood and personality disorders, and it is undisputed that those two disorders were not the severe mental disorder in this case.

The People must prove Bendovid was treated for *the* severe mental disorder that subjects him to the MDO commitment. (*People v. Sheek*, *supra*, 122 Cal.App.4th at p. 1611.)  Proof that he was treated for other mental disorders is not sufficient.  (*Ibid.*)  The statute is mandatory.  "Section 2962, subdivision (c) specifically refers to treatment of 'the' mental disorder, not 'a' mental disorder."  (*People v. Garcia*, *supra*, 127 Cal.App.4th at p. 567.)  Consequently, mental health treatment for some mental disorders may not be substituted in place of treatment for *the severe mental disorder*.  (*Ibid.*; *Sheek*, at p. 1611.)

Here the People "attempt to bootstrap the treatment defendant received" for the mood and borderline personality disorders in place of treatment for the delusional disorder. (*People v. Sheek*, *supra*, 122 Cal.App.4th at p. 1611.)  "This position cannot be reconciled with either the letter or the spirit of the statute, which provides that '[t]he prisoner has been in treatment for *the severe mental disorder . . . .*'"  (*Ibid.*)  "Given that the People failed to offer any proof that defendant's [delusional disorder] was diagnosed before [May 20, 2017], it necessarily follows that defendant was not treated *for that*

12

*disorder*" in jail.  (*Ibid.*)  Consequently, the 90-day treatment requirement was not satisfied.  (*Ibid.*)

DISPOSITION

The judgment (order) is reversed.

CERTIFIED FOR PUBLICATION.


GILBERT, P. J.

We concur:


PERREN, J.


TANGEMAN, J.

Ginger E. Garrett, Judge

Superior Court County of San Luis Obispo

_____

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Christopher G. Sanchez, Deputy Attorney General, for Plaintiff and Respondent.