Filed 10/21/20  P. v. J.T. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073834 |
| v. | (Super.Ct.No. RIF1203670) |
| J.T., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jeffrey Prevost, Judge.  Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos, Seth M. Friedman and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant J.T. appeals from the August 1, 2019 order extending his commitment as a mentally disordered offender (MDO) pursuant to Penal Code section

1

2970.  He contends the evidence was insufficient as a matter of law to sustain the petition.  We affirm.

I.

PROCEDURAL AND FACTUAL HISTORY

A.  *Procedural History and Defendant's Criminal Background*

In September 2006, defendant was stopped by police officers while walking down a public street in Riverside with a .357 rifle.  Defendant put the rifle down after multiple officers responded.  He told an officer he had used methamphetamine three days earlier and had drank alcohol that day.  He pleaded guilty to possession of a firearm by a felon. (Pen. Code, former § 12021, subd. (a)(1).)  He was later committed to the California Department of State Hospitals as an MDO and treated at Atascadero State Hospital (Atascadero) from May 2007 to January 2009 when he was released back into the community.

In May 2012, defendant assaulted L.J. with a pipe.  L.J. was at her friend K.B.'s house in Riverside.  Defendant, who L.J. had never met before, was inside the house with K.B.'s 11-year-old goddaughter and her friend.  One of the girls told L.J. that defendant asked them to watch pornography with him.  L.J. and K.B. asked defendant to leave. Defendant refused, and an argument ensued.  Defendant called L.J. a "bitch" and a "cunt" and swung a metal pipe at her head.  L.J. put up her arm to protect herself, and the pipe struck her left hand.  Defendant pleaded guilty to felony assault with a deadly weapon in July 2013.  (Pen. Code, § 245, subd. (a)(1).)  He served his sentence at Valley State Prison.

2

In January 2014, while housed in Valley State Prison, defendant assaulted fellow inmate F.G. by biting off the tip of his nose. Defendant shared a cell with six or eight other inmates at the time. A correctional officer responded to a fight inside the cell and found F.G. standing near the door with a bloody towel over his nose and defendant sitting on a bunk breathing heavily. Defendant had blood on his lips and teeth. None of the other inmates in the cell had blood on them. F.G. was taken to the hospital, but they were not able to reattach the tip of his nose. Charges related to this incident were filed in Madera County.

In 2015, defendant was admitted to Atascadero under a dual commitment as an MDO on the 2012 assault of L.J. and as incompetent to stand trial on the 2014 assault of F.G. Between 2015 and 2018, defendant went back and forth between Atascadero and the Madera County Jail at least twice as his competency to stand trial was established and then deteriorated again.

During this period, the Riverside County District Attorney's Office filed a petition under Penal Code section 2970 to continue defendant's involuntary treatment as an MDO for another year. Defendant admitted the petition in November 2017, and the trial court extended his commitment to March 2019.

In October 2018, defendant pleaded guilty in the Madera County case to misdemeanor assault of F.G. by means of force likely to cause great bodily injury. (Pen. Code, § 245, subd. (a)(4).) He returned to Atascadero in November 2018 for continued treatment as an MDO.

3

In January 2019, the Riverside County District Attorney's Office initiated the proceedings below by filing a petition under Penal Code section 2970 to continue defendant's involuntary treatment as an MDO for another year. The first trial on the petition resulted in a hung jury. The second trial resulted in a true finding.

On August 1, 2019, the trial court issued an order extending defendant's commitment as an MDO to March 14, 2020. Defendant timely filed a notice of appeal.

On April 8, 2020, while the appeal was pending, the trial court extended defendant's commitment as an MDO to March 14, 2021, following a stipulation by the parties to extend the commitment for another year. We granted respondent's request for judicial notice of the commitment order and of the relevant minute orders from the superior court file, dated April 8, 2020 and May 19, 2020, that reflect the trial court's commitment order. (Evid. Code, §§ 452, subd. (d)(1), 459.)

*B. Trial Testimony Related to Defendant's Mental Health Condition*

<u>Alejandro Perez</u>

Psychiatrist Alejandro Perez treated defendant at Atascadero from November 2018 through January 2019. He diagnosed defendant with schizophrenia, antisocial personality disorder, and substance abuse disorders. His primary diagnosis was schizophrenia, which is a brain disease that cannot be cured, but can be managed by medication. Its symptoms include delusional thoughts, hallucinations, paranoid ideation, and disorganized speaking and behaviors.

4

When defendant arrived at Atascadero in November 2018, he was taking the antipsychotic medication Geodon to treat his schizophrenia. Perez increased the dose defendant was taking from 40 milligrams a day to 80 milligrams a day. Then in January 2019, he increased the dose to 120 milligrams a day. Despite the increases, defendant continued to have a persistent systematized delusional belief system that signified that he was not in remission.

Perez spoke with defendant about his prior convictions. With regard to the 2012 assault of L.J., defendant told Perez he was protecting himself from witches who were after him. He said the witches were trying to have sex with him and cut up his body so they could extract his inner light, which was a special power that allowed defendant to control fire and create explosions. Defendant also told Perez that while he was housed in the California Department of Corrections and Rehabilitation (CDCR) inmates tried to kill him to remove his inner light. He responded violently to protect himself. In both situations, defendant felt he was in genuine danger and that he had responded appropriately.

Defendant also told Perez about a program in Riverside that was trying to locate him to liquify his limbs, and that there have been many women throughout his life who have tried to have sex with him to remove parts of his body. Defendant also said he had seen demons. He described hearing voices and seeing cat eyes stare at him, although he said the last time he experienced the hallucinations was several years earlier when he had

5

used methamphetamine. Defendant did not believe he had a mental illness. He attributed the hallucinations to his prior methamphetamine use.

Defendant did not engage in any violent behavior while under Perez's care. The only incident that occurred was in December 2018 when hospital staff found a modified pen in defendant's room. Staff was concerned about the possibility that defendant could use the pen as a stabbing device. Defendant was counseled about it, and no further issues were noted.

Perez assessed defendant at a low-to-moderate risk for violence when he was in a controlled setting like Atascadero and taking his medication, although he believed defendant's risk for violence would be elevated in the community, particularly if he were not taking his medication. Perez did not believe defendant would continue taking his medication if released because defendant did not believe he had a mental illness. Perez explained that if defendant were to stop taking his medication, it would increase his psychotic symptoms, which in turn would increase defendant's risk of physical harm to others. Perez believed it was possible that defendant would react violently if he felt unsafe because he had a history of doing so, and a pattern of past violence is the greatest predictor of future violence.

Valerie Davis

Psychiatrist Valerie Davis treated defendant at Atascadero for roughly six weeks in January and February 2019. She also diagnosed defendant with schizophrenia.

6

Davis described defendant's progress as having plateaued. Defendant was taking a 120-milligram dose of Geodon while under Davis's care, but even at that medication level, he continued to maintain a delusional belief system and experience mild hallucinations. As examples of this, Davis reported that in February 2019, defendant told a nurse practitioner that he sees demons. He also told Davis that witches exist, and he told Perez that it was witches in the CDCR who tried to take away his inner light in the 2014 incident. Davis explained that defendant did not understand the delusions and hallucinations he experienced were symptoms of his illness. He did not believe he had schizophrenia and did not understand the warning signs or triggers of his illness, nor did he understand that he needed medication. He took his medication voluntarily, but reluctantly. He asked Davis multiple times to reduce the dose because he did not believe he needed such a high dose.

Defendant was not in remission when Davis treated him because he was mildly symptomatic on the dose of medication he was taking, and he was not willing to increase the dose enough to make his symptoms go away. Davis did not believe defendant would continue taking medication on his own if released. She also believed that if he stopped taking his medication his symptoms would return; he would become more paranoid and would begin hallucinating more frequently and more vividly.

Even though defendant did not engage in any violent behavior while under her care, Davis believed defendant presented a danger to the community because he

7

continued to believe that there were people in the community who were out to get him and witches who wanted to harm him.

Prakash Kamalnath

Psychiatrist Prakash Kamalnath treated defendant while he was housed in the Riverside County Jail pending the instant trial. He met with defendant twice, once in March and once in April 2019. He scheduled four additional appointments with defendant in June and July 2019, but defendant did not attend them.

Kamalnath diagnosed defendant with schizophrenia. He described defendant as symptomatic but stable. Defendant was not experiencing any overt psychotic symptoms while under Kamalnath's care, but he continued to maintain an internal paranoid delusional thought process. For example, he continued to believe that he acted appropriately when he hit L.J. with the pipe because he believed she was a witch and he needed to protect himself. As for the incident in the CDCR, defendant told Kamalnath that other inmates had challenged him to bite F.G.'s nose off.

Kamalnath reduced the dosage of defendant's medication from 120 milligrams per day to 80 milligrams per day. He did this at defendant's request and in an effort to get defendant to continue taking his medication. Kamalnath believed defendant had a superficial understanding of his mental illness and the need for medication, but he was not sure if defendant would continue taking his medication if released. Kamalnath was not willing to predict what would happen if defendant stopped taking his medication, but he explained that a person's functioning level decreases if they are not on the correct

8

medication, and the danger is that a person who has been violent in the past could be violent again.

B.F.

Inmate B.F. was housed near defendant in the Riverside County Jail for four months in 2019. During that time, B.F. saw defendant pacing back and forth and talking to himself. On one occasion defendant told B.F. he wanted to bite a deputy's face off. B.F. was concerned by the comment and told a sergeant about it. This was not the first time B.F. had seen defendant talking to himself. On another occasion, defendant told B.F. that evil demons spoke to him. He referred to the demons as "the jug." Defendant would look at the wall or ceiling and say things like, "the jug is here" or "the jug is with me right now."

Angie Shenouda

MDO evaluator and forensic psychologist Angie Shenouda reviewed defendant's medical and legal records and interviewed him in November 2018. She agreed with the other doctors that defendant had schizophrenia.

She concluded defendant's schizophrenia was not in remission because he was currently symptomatic. Jail records as recent as March and May 2019 described defendant talking to himself and expressing delusional beliefs. Defendant also expressed delusional beliefs in his interview with Shenouda. He told Shenouda about witches and people who were out to get him. He said he was afraid of being paroled into Riverside County because he believed the parole office would send people to eat him. He also

9

believed the justice system was programming him, which meant they were going to kill him. Some of defendant's thoughts were hard for Shenouda to follow. He talked about the FBI and a database that creates people by inserting something into their stomach and linking them to a computer. He also talked about someone putting a bar code on his chest, people chanting over his body, and about steaks having been made from his body that were valued at one million dollars. Defendant also discussed his 2006 conviction with Shenouda. He said he was carrying a loaded gun in public because voices had told him to get a gun and protect himself from people who were out to harm him.

Shenouda believed defendant was at a higher risk of engaging in physical violence while he was symptomatic because he had a well-founded history of doing so. All three of his prior convictions—the 2006 possession of a firearm, the 2012 assault of L.J. and the 2014 assault of F.G.—were committed while defendant was symptomatic. Defendant had also engaged in threatening behavior while apparently symptomatic. In 2017, defendant threatened a deputy at the Madera County Jail, and after he calmed down, he was seen pretending to eat an imaginary food item. Then in 2019, while apparently experiencing psychiatric instability, defendant expressed the desire to bite a deputy's face. Shenouda acknowledged on cross-examination that she had not reviewed defendant's prison records but had assumed defendant was not taking medication in 2014 when he assaulted F.G. based on her review of other data.

Defendant had poor insight into his mental illness because he did not believe he suffered from any psychiatric symptoms unless he was abusing methamphetamine.

10

Shenouda explained that a patient's insight into their mental illness is important because a person will not take medication for an illness they do not believe they have, and medication is the primary mode of treatment for schizophrenia. Shenouda did not believe defendant would take his medication if unconditionally released because he told her he would not take medication unless he was released into the conditional release program. He had also refused to take his medication once in April 2019, and an incident report from January 2017 indicated Madera County jail staff found several unused medications in defendant's cell. On cross examination Shenouda acknowledged the incident report did not indicate whether the unused medication found in defendant's cell was psychotropic medication.

Shenouda concluded that defendant represented a substantial risk of physical harm to others due to his schizophrenia because he had a history of engaging in violence when symptomatic, and he was currently symptomatic, which elevated his risk for future violence. He also lacked insight into his mental illness and the need for treatment, and without treatment his symptoms would be exacerbated that would elevate his risk for becoming violent in the community.

## II.

## DISCUSSION

"The Mentally Disordered Offender Act (MDO Act), enacted in 1985, requires that offenders who have been convicted of violent crimes related to their mental disorders, and who continue to pose a danger to society, receive mental health treatment during and after the termination of their parole until their mental disorder can be kept in

11

remission.  (Pen. Code, § 2960, et seq.)"  (*In re Qawi* (2004) 32 Cal.4th 1, 9.)  "Commitment as an MDO is not indefinite; instead, '[a]n MDO is committed for . . . one-year period[s] and thereafter has the right to be released unless the People prove beyond a reasonable doubt that he or she should be recommitted for another year.'  [Citation.]"  (*Lopez v. Superior Court* (2010) 50 Cal.4th 1055, 1063, disapproved on other grounds in *People v. Harrison* (2013) 57 Cal.4th 1211, 1230, fn. 2.)

A.  *The Appeal is Not Moot*

Respondent contends the present appeal is moot because while the appeal was pending the parties entered into a stipulation to continue defendant's commitment as an MDO for another year, and as a result, there can be no practical effect from this court reviewing the August 1, 2019 commitment order.

"A case becomes moot when a court ruling can have no practical effect or cannot provide the parties with effective relief."  (*People v. Dunely* (2016) 247 Cal.App.4th 1438, 1445.)  Generally, an appeal from an MDO commitment order becomes moot if it has not been decided by the time the commitment period expires.  (*People v. Merfield* (2007) 147 Cal.App.4th 1071, 1074.)  However, if the defendant raises an issue that could affect the trial court's jurisdiction over subsequent recommitment proceedings, the appeal cannot be considered moot.  For example, in *People v. J.S.* (2014) 229 Cal.App.4th 163, 171, we held that "at least where the People seek to continue an offender's involuntary treatment beyond the initial one-year term, an offender's challenge to the validity of the initial determination that he or she qualifies as an MDO could have significant practical effects, and cannot be considered moot."  Our rationale was based on

12

the premise that, "if an offender's initial commitment is improper, any extended commitment would also be improper." (*Ibid.*)

*People v. Fernandez* (1999) 70 Cal.App.4th 117, came to a similar conclusion in an appeal from a recommitment order. In *Fernandez,* the defendant challenged the court's recommitment order because the prosecution failed to comply with statutory time limits in filing the petition and bringing the case to trial. (*Id.* at pp. 126-127.) While the appeal was pending, the defendant's commitment term expired, and the trial court extended the commitment for another year. (*Id.* at p. 134.) The *Fernandez* court concluded the appeal was not moot because their decision had the potential to "affect the lower court's right to continue jurisdiction under the original commitment as well as the recommitment." (*Id.* at pp. 134-135; accord *People v. Mord* (1988) 197 Cal.App.3d 1090, 1115.)

In the present appeal, defendant challenges the sufficiency of the evidence. The remedy for a successful insufficiency of the evidence claim in an MDO proceeding is reversal of the commitment order. (See, e.g., *People v. Bendovid* (2018) 30 Cal.App.5th 585, 594-595.) Accordingly, defendant's appeal is not moot because his claim, if successful, could affect the trial court's jurisdiction over subsequent recommitment proceedings. (See also *People v. Hernandez* (2011) 201 Cal.App.4th 483, 487, fn. 3 [MDO appeal is not moot when parties stipulate to a recommitment while the appeal is pending because the stipulation may have been predicated on the pendency of the appeal].) We therefore proceed to the merits of defendant's contention.

*B. There Was Sufficient Evidence to Sustain the Petition*

Defendant contends the August 1, 2019 recommitment order must be set aside because the evidence was insufficient to establish that he poses a substantial risk of physical harm to others. We disagree.

"In considering the sufficiency of the evidence to support MDO findings, an appellate court must determine whether, on the whole record, a rational trier of fact could have found that defendant is an MDO beyond a reasonable doubt, considering all the evidence in the light which is most favorable to the People, and drawing all inferences the trier could reasonably have made to support the finding. [Citation.] ' " 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the [finding] is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. . . .' [Citation]" ' " (*People v. Clark* (2000) 82 Cal.App.4th 1072, 1082-1083.)

To obtain an order extending the defendant's commitment as an MDO, the People must prove that: (1) the defendant continues to have a severe mental health disorder; (2) the defendant's severe mental health disorder is not in remission or cannot be kept in remission without treatment; and (3) because of his or her severe mental health disorder, the defendant continues to represent a substantial danger of physical harm to others. (§ 2972, subd. (c); *People v. Beeson* (2002) 99 Cal.App.4th 1393, 1398-1399.) The People may present evidence of the defendant's prior violent offenses and mental health

14

history to satisfy these elements (*People v. Pace* (1994) 27 Cal.App.4th 795, 799), but the focus of a recommitment proceeding is on the defendant's current condition and whether his or her current condition justifies an extension of the commitment (*People v. Cobb* (2010) 48 Cal.4th 243, 252).

The first element is not in dispute. All four of the doctors diagnosed defendant with schizophrenia, which qualifies as a severe mental health disorder. (Pen. Code, § 2962, subd. (a)(2).)

The second element—lack of remission—can be proven in one of two ways, either by proof that the defendant's severe mental health disorder is not in remission, or that it cannot be kept in remission without treatment. (Pen. Code, § 2972, subd. (c).) Remission, for purposes of an MDO proceeding, is defined as "a finding that the overt signs and symptoms of the severe mental health disorder are controlled either by psychotropic medication or psychosocial support." (Pen. Code, 2962, subd. (a)(3).) Doctors Perez, Davis and Shenouda all testified that defendant was not in remission. Kamalnath did not directly give an opinion on whether defendant was in remission, but like the others, he testified that defendant was still experiencing a delusional thought process despite the medication. This was sufficient evidence for the jury to conclude defendant was not in remission. We therefore need not address defendant's argument that the evidence did not show any recent instances of violence, threats, property damage, or noncompliance with treatment plans, as those are factors for assessing whether a defendant's mental health disorder can be kept in remission without treatment. (Pen. Code, § 2962, subd. (a)(3).)

15

As for the third element—substantial danger of physical harm—the evidence showed that defendant had a history of engaging in violent and threatening behavior while symptomatic and of responding violently when he feels threatened by people who he perceives to be witches. In 2006, defendant openly carried a .357 rifle on a public street because voices told him to get a gun and protect himself from people who were out to harm him. In 2012, he hit L.J. with a pipe because he believed she was a witch and he needed to protect himself. In 2014, he bit the tip off of F.G.'s nose because he believed inmates in the prison, who he had described as witches, were trying to take away his inner light and he needed to protect himself. In 2017, he threatened custodial staff at the Madera County Jail and after he calmed down, was observed to be eating an imaginary food item. And in 2019, he told an inmate at the Riverside County Jail that demons, who he referred to as "the jug," spoke to him and that he wanted to bite a deputy's face off.

The evidence also showed that despite the increases in medication and treatment defendant received over the past year, he continues to maintain delusional beliefs, including that witches exist, and he has not gained the insight to understand that his delusional beliefs are a symptom of an illness that needs to be treated with medication. Doctors Perez, Davis and Shenouda all testified that they did not believe defendant would continue taking his medication if released and that his psychotic symptoms would increase if he were to discontinue his medication. Perez and Shenouda further testified that given defendant's history of engaging in violence while symptomatic, this would increase the risk of physical harm he presented to others. Davis believed defendant presented a danger to the community by virtue of his continued delusional belief that

16

there were witches and people in the community who want to harm him. Finally, Perez testified that a pattern of past violence is the greatest predictor of future violence, and Kamalnath testified that there was a danger that a person who had been violent in the past could be violent again. This was sufficient evidence for the jury to conclude defendant presented a substantial danger of physical harm to others due to his severe mental disorder.

Defendant contends the evidence did not show that he presented a substantial danger of physical harm to others because he has not engaged in any violence related to his mental illness in the past year. However, the law does not require a recent overt act of violence to satisfy this element. " 'The dangerous[ness] finding requires only an assessment of future dangerousness. It does not require proof of a recent overt act." (*People v. McKee* (2010) 47 Cal.4th 1172, 1203; accord, *In re Qawi*, *supra*, 32 Cal.4th at p. 24; see Pen. Code, § 2962, subd. (g) ["As used in this chapter, 'substantial danger of physical harm' does not require proof of a recent overt act."].) Defendant's argument that under *In re Qawi*, *supra*, 32 Cal.4th at p. 24, the substantial danger element requires a finding of recent dangerousness is based on a misreading of the case. In *Qawi*, the court addressed both the MDO Act and the Lanterman-Petris-Short (LPS) Act. The court was referring to the LPS Act (specifically Welfare and Institutions Code section 5300) when it discussed the requirement of a finding of recent dangerousness, not the MDO Act. (*In re Qawi*, *supra*, 32 Cal. 4th at p. 24.)

Finally, we reject defendant's arguments that the medical experts speculated about defendant's dangerousness based on remote past events rather than making a reasonable

17

inference as to his current potential for violence, and that Shenouda's opinion was based on misrepresentations of fact and a great deal of conjecture. In MDO proceedings, mental health professionals are entitled to give their opinion on the defendant's future dangerousness. (*In re Qawi*, *supra,* 32 Cal.4th at p. 24.) In doing so, they may take into account the defendant's prior violent offenses and his mental health history. (*People v. Pace*, *supra*, 27 Cal.App.4th at p. 799.) The trier of fact then gets to decide what weight to give the opinion. (*People v. Ward* (1999) 71 Cal.App.4th 368, 374.) Here, the doctors' opinions were not based on speculation. They were based on an assessment of defendant's prior violent offenses and mental health history. The jury was free to accept or reject the opinions given. We do not reassess the credibility of experts or reweigh the relative strength of their conclusions. (*People v. Poe* (1999) 74 Cal.App.4th 826, 830.)

As for Shenouda's testimony, the jury was well aware that the defense contested her opinion and disputed the facts on which she relied. On cross examination and in closing argument, defense counsel challenged many of the misrepresentations that were identified in defendant's briefing. But Shenouda was only one of four mental health professionals to testify and even if the jury disregarded her opinion there was still sufficient evidence in the record to sustain the petition. Doctors Perez, Davis and Kamalnath all testified that defendant had schizophrenia, that he was still actively delusional despite taking medication, and that given his assaults on L.J. and F.G, he had a history of engaging in violent behavior while symptomatic. Additionally, Perez and Davis did not believe defendant would take his medication if released. Perez believed this would increase the risk of physical harm defendant presented to others and Davis

18

believed defendant presented a danger to the community by virtue of his continued belief that there were witches and people in the community who want to harm him.

In sum, substantial evidence supports the jury's conclusion that defendant's schizophrenia, which is not in remission, renders defendant a substantial danger to others. We therefore affirm the judgment.

## III.

## DISPOSITION

The trial court's order filed August 1, 2019, extending defendant's commitment to March 14, 2020, is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____
P. J.

We concur:

McKINSTER _____
J.

SLOUGH _____
J.

19